**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MICHAEL ROBERT PULIDO,
            *Petitioner-Appellee,*

v.

CHRIS CHRONES; A. HEDGPETH,
            *Respondents-Appellants.*

No. 05-15916

D.C. No.
CV-99-04933-CW

OPINION

On Remand From The Supreme Court of the United States

Filed December 21, 2010

Before: Alfred T. Goodwin, Diarmuid F. O'Scannlain and
Sidney R. Thomas, Circuit Judges.*

Opinion by Judge O'Scannlain;
Dissent by Judge Thomas

---

*The panel unanimously finds this case suitable for decision without additional oral argument. *See* Fed. R. App. P. 34(a)(2).

20383

**COUNSEL**

J. Bradley O'Connell filed the post-Supreme Court remand brief for the petitioner-appellee.

Jeremy Friedlander, Deputy Attorney General, San Francisco, California, filed the post-Supreme Court remand brief for the respondent-appellant. With him on the brief were Edmund G. Brown, Jr., Attorney General; Dane R. Gillette, Chief Assistant Attorney General; Gerald A. Engler, Senior Assistant Attorney General; and Peggy S. Ruffra, Supervising Deputy Attorney General, San Francisco, California.

**OPINION**

O'SCANNLAIN, Circuit Judge:

We must decide whether erroneous jury instructions in a state murder trial were prejudicial as a matter of federal Constitutional law.

I

A

During the predawn hours of May 24, 1992, Ramon Flores, an attendant at a Shell gas station convenience store in San Mateo, California, was shot in the face with a .45-caliber bullet.[1]

---

[1]These facts are summarized from the California Supreme Court's opinion affirming Pulido's conviction. *See People v. Pulido*, 936 P.2d 1235, 1237-38 (Cal. 1997).

He died almost instantaneously. There were no witnesses to the crime, but a neighbor heard a loud bang coming from near the station around 3:45 a.m. and then a voice yelling as if addressing someone else. A Coke can was found on the store's counter. Michael Pulido's thumbprint was on the can. A cash register, which had been removed from the store, was found later that morning in some bushes. Pulido's fingerprints were on the cash register.

At the time, Pulido, who was sixteen years old, lived with his uncle, Michael Aragon, and Aragon's cohabitant, Laura Moore. Aragon, Moore, two of their children, and a neighbor had previously seen Pulido with a .45-caliber Colt pistol. On two occasions, Pulido had observed to Aragon that the Shell station would be easy to rob because the attendant was always asleep. Aragon and Moore testified that when they got up at 3 a.m. on the morning of the robbery to care for their baby, Pulido was not at home. However, when they awoke later that morning, Pulido was in the living room, already dressed. Pulido showed Aragon his wallet and said, "Look unc, almost all ones." Later that day, Moore insisted that Pulido dispose of his gun. Pulido took the gun apart and discarded most of the pieces. Moore retained some of the pieces to prevent reassembly and turned them over to police, who determined that they came from a .45-caliber Colt.

When Pulido was arrested on an unrelated auto theft charge two weeks later, he told police he had information about the robbery and murder. He led police to some discarded .45-caliber cartridges with ejection marks resembling those on a cartridge found at the gas station. He also made several inconsistent exculpatory statements to police, first blaming a drug dealer named Carlos Vasquez, then his stepfather, Eduardo Alarcon, and finally, an unidentified Tongan male for the robbery and murder. Aragon testified, however, that Pulido had confessed to the crimes while the two were having dinner at a pizza parlor. Pulido told Aragon that he went to the gas station, bought a Coke, and left. He then returned and saw that

the attendant was asleep. Although he considered shooting the attendant through the window, he decided instead to go inside and ask for another Coke. He shot Flores in the face, then ripped out the cash register and went back to his car. Pulido recanted this confession while in jail, however, writing in a letter to Moore: "If unc is reading this, tell him I didn't kill that guy, I was just messing with him."

At trial, Pulido claimed for the first time that Aragon had killed Flores. According to Pulido, he and Aragon were together the night of May 23 and ended up at the Shell station after Aragon smoked crack cocaine at Hunters Point. Pulido testified that he waited outside while Aragon went in to buy matches or cigarettes. After hearing a gunshot, Pulido ran into the store and saw Aragon holding Pulido's gun. Flores was lying on the floor, bleeding from a shot to the face. Pulido yelled at Aragon, ran out of the store, and got back into the car. Moments later, Aragon came out with the cash register and threw it on Pulido's lap. As they drove away, Aragon forced Pulido at gunpoint to open the cash register. Pulido handed the cash over to Aragon, then tossed the cash register into some bushes.

At the time of the shooting, Aragon was on probation for 1989 convictions for burglary, possession of cocaine, and contributing to the delinquency of a minor. Although Aragon denied using cocaine that night, Aragon's sister testified that he was "on something" when she saw him either on May 24 or 25, and her son testified that Aragon was acting paranoid and smelled of crack cocaine. A police detective testified that Aragon had first claimed that he had gotten up at 12:15 a.m. to take care of the baby, but when interviewed with Moore at the police station, both said that it was around 3 a.m.

No physical evidence linked Aragon to the crime.

B

Pulido was convicted in the San Mateo County Superior Court of first-degree felony murder, robbery, receiving stolen property, and auto theft. The jury deadlocked on whether Pulido personally used a firearm and personally inflicted great bodily injury[2] but unanimously returned a special-circumstance finding of robbery-murder. Pulido was sentenced to life in prison without the possibility of parole.

On direct appeal, Pulido argued that the jury instructions on aiding and abetting felony murder and robbery, read together, impermissibly allowed him to be convicted of felony murder even if he did not form the intent to aid and to abet the robbery until *after* the murder. The California Supreme Court agreed that the felony-murder rule did not "include aiders and abettors or conspirators who join the felonious enterprise only after the murder has been completed," and that the instructions "could well suggest to a jury that a person who aids and abets only in the asportation phase of robbery, after the killing is complete, is nonetheless guilty of first degree murder under the felony-murder rule." *People v. Pulido*, 936 P.2d 1235, 1243, 1245 (Cal. 1997) ("*Pulido I*"). The court upheld Pulido's conviction, however, on the ground that Pulido did not suffer any prejudice from the instructional error. In particular, the court concluded that the jury's robbery-murder special-circumstance finding "demonstrates the jury did not accept the theory defendant joined the robbery only after Flores was killed," but rather "found—explicitly, unanimously and necessarily—that defendant's involvement in the robbery, whether as a direct perpetrator or as aider and abettor, commenced before or during the killing of Flores." *Id.* at 1244.

Pulido thereafter filed this federal habeas petition, which the district court granted after discovering that the other spe-

---

[2]The jury deadlocked 8 to 4, but it is unknown whether the jury was leaning toward or against the allegations.

cial circumstance instruction—not relied upon by the California Supreme Court or by Pulido—was also defective. *Pulido v. Lamarque*, No. 99-4933, 2005 WL 6142229, at *14-*20 (N.D. Cal. Mar. 24, 2005) ("*Pulido II*"). Namely, it contained a typographical error, using the word "or" instead of "and" between its two prongs, thus enlarging the scope of activity that would qualify as robbery felony murder under the special circumstance. *Id.* at *14. Because the district court could not "be reasonably certain that the jury, if required to do so, would have found that [Pulido's] involvement in the robbery preceded the victim's death," the court was "left with grave doubt as to the likely effect of [the] error on the jury's verdict." *Id.* at *20 (internal quotation marks omitted). Therefore, the district court concluded that Pulido was entitled to habeas relief on this claim of instructional error. *Id.*

We affirmed, concluding that the instructional error was structural, and that the verdict must be reversed because we could not be " 'absolutely certain' that the jury found that Pulido's crime of robbery was committed contemporaneously with the murder." *Pulido v. Chrones*, 487 F.3d 669, 676 (9th Cir. 2007) (per curiam) ("*Pulido III*") (quoting *Lara v. Ryan*, 455 F.3d 1080, 1086 (9th Cir. 2006)). The Supreme Court vacated our decision, however, holding that we were "wrong to categorize this type of error as 'structural' " rather than "ask[ing] whether the flaw in the instructions 'had substantial and injurious effect or influence in determining the jury's verdict.' " *Hedgpeth v. Pulido*, 129 S. Ct. 530, 530-31 (2008) (per curiam) ("*Pulido IV*") (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)). Thus, the Court remanded for us to determine, in the first instance, whether Pulido was actually prejudiced by the faulty jury instructions. *Id.* at 533 & n.*.

II

Pulido contends that the error in the felony-murder instructions, combined with the newly discovered error in the special-circumstance instruction, prejudiced him by allowing

the jury to convict him based on the invalid theory that he did not join in the robbery until after Flores was murdered (the "late-joiner theory").

**[1]** "When considering an allegedly erroneous jury instruction in a habeas proceeding, [we] first consider whether the error in the challenged instruction, if any, amounted to 'constitutional error.' " *Morris v. Woodford*, 273 F.3d 826, 833 (9th Cir. 2001) (quoting *Calderon v. Coleman*, 525 U.S. 141, 146 (1998) (per curiam)). Where, as here, constitutional error is conceded, we proceed directly to the question of prejudice. *See id.*

**[2]** In *Fry v. Pliler*, 551 U.S. 112 (2007), the Supreme Court clarified that the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") did not replace the traditional test for prejudice on collateral review—i.e., whether the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 623. Moreover, *Fry* explained that we need not conduct an analysis under AEDPA of whether the state court's harmlessness determination on direct review—which is governed by the "harmless beyond a reasonable doubt" test set forth in *Chapman v. California*, 386 U.S. 18, 24 (1967)—was contrary to or an unreasonable application of clearly established federal law. *Fry*, 551 U.S. at 119-20 (citing 28 U.S.C. § 2254(d)(1)). This is because the *Brecht* test "obviously subsumes" the "more liberal AEDPA/*Chapman* standard which requires only that the state court's harmless-beyond-a-reasonable-doubt determination be unreasonable." *Id.* at 120. Accordingly, we apply the *Brecht* test without regard for the state court's harmlessness determination.[3] *See id.* at 121-22.

**[3]** Under *Brecht*, an instructional error is prejudicial and

---

[3]It follows that we apply *Brecht* "whether or not the state appellate court recognized the error and reviewed it for harmlessness" under *Chapman*. *Fry*, 551 U.S. at 121-22.

habeas relief is appropriate only if, after reviewing the record as a whole, we conclude that there was a substantial and injurious effect or influence on the verdict, or if we are "left in grave doubt" as to whether there was such an effect. *Kotteakos v. United States*, 328 U.S. 750, 765 (1946). Grave doubt exists in the "unusual" circumstance where, "in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." *O'Neal v. McAninch*, 513 U.S. 432, 435 (1995).

**[4]** We must "take account of what the error meant to [the jury], not singled out and standing alone, but in relation to all else that happened." *Kotteakos*, 328 U.S. at 764. Hence, "we accept at the outset the well established proposition that a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Cupp v. Naughten*, 414 U.S. 141, 146-47 (1973). This proposition recognizes that "not only is the challenged instruction but one of many such instructions, but the process of instruction itself is but one of several components of the trial which may result in the judgment of conviction," including "testimony of witnesses, argument of counsel, [and] receipt of exhibits in evidence." *Id.* at 147.

### III

We begin by considering whether the jury's special-circumstance finding rendered the instructional errors harmless.

### A

**[5]** The introductory special-circumstance instruction, California Jury Instructions—Criminal ("CALJIC") 8.80.1, began as follows:

> If you find the defendant in this case guilty of murder of the first degree, you must then determine

if the following special circumstance is true or not true: that the murder was committed *while* the defendant was engaged in or was an accomplice in the commission of, attempted commission of, or the immediate flight after committing or attempting to commit robbery.

(emphasis added). As the California Supreme Court observed, this statement properly instructed the jury that "the robbery-murder special-circumstance allegation could not be found true unless [Pulido] was engaged in the robbery *at the time of the killing*." *Pulido I*, 936 P.2d at 1243.

**[6]** CALJIC 8.80.1 further instructed the jury that if it could not determine whether Pulido was "the actual killer or an aider and abettor," it could not find the special circumstance unless (1) "the defendant *with the intent to kill* aided, abetted, . . . or assisted any actor in the commission of the murder in the first degree," or (2) "*with reckless indifference to human life* and as a major participant, aided, abetted, . . . or assisted in the commission of the crime of robbery." (emphases added). If the jury found the special circumstance on the basis of the "intent to kill" prong, it must have concluded that Pulido's involvement in the robbery preceded the murder. Therefore, Pulido focuses on the "reckless indifference/major participant" prong, contending that the jury construed it in such a way as to find the special circumstance even if it believed his late-joiner theory.

Taking Pulido's theory of events as true, it is not implausible that the jury would have considered Pulido a "major participant" in the two-person robbery. The question thus boils down to whether the jury also found that Pulido acted with "reckless indifference to human life" based solely on his post-killing actions.

1

Because the prosecution did not rely on the "reckless indifference" prong, that term was not defined for the jury.[4] However, the California Supreme Court has deemed the legal meaning of "reckless indifference to human life" to be exactly the same as its commonsense meaning—"a defendant's subjective awareness of the grave risk to human life created by his or her participation in the underlying felony"—thus eliminating any need for clarification for the jury. *People v. Estrada*, 904 P.2d 1197, 1203 (Cal. 1995).

[7] It strains credulity to argue that *post-killing* participation in a robbery, by itself, created a "grave risk" to a life that had already been taken.[5] Under the late-joiner theory, the only

---

[4]Instead, the prosecution relied on the more rigorous "intent to kill" prong, telling the jury at closing, "If you believe the defendant was the aider and abettor and not the actual shooter, then the *only way* the special circumstance becomes applicable, is if you feel that *when the killing occurred*, the defendant, although not the killer, *intended to kill*—he knew that was going to happen and he wanted it to happen." (emphases added). Although "arguments of counsel generally carry less weight with a jury than do instructions from the court," *Boyde v. California*, 494 U.S. 370, 384 (1990), a court may "assum[e] that counsel's arguments clarified an ambiguous jury charge," *Middleton v. McNeil*, 541 U.S. 433, 437 (2004) (per curiam). "This assumption is particularly apt when it is the *prosecutor's* argument that resolves an ambiguity in favor of the *defendant*." *Id.* By relying solely on the "intent to kill" prong, the prosecution resolved any ambiguity as to the timing requirement in favor of the defense.

[5]The robbery-murder cases cited by Pulido in support of this proposition are distinguishable. The defendants in these cases each participated in the robbery and were aware of the grave risk to human life *before or during* the killing. *See People v. Smith*, 38 Cal. Rptr. 3d 1, 11 (Ct. App. 2005) (defendant who served as the lookout "gained a subjective awareness of grave risk to human life during the many tumultuous minutes" it took for his accomplice to beat and stab the victim) (internal quotation marks omitted)), *abrogated on other grounds as recognized in People v. Garcia*, 85 Cal. Rptr. 3d 393, 420 (Ct. App. 2008); *People v. Hodgson*, 3 Cal. Rptr. 3d 575, 585 (Ct. App. 2003) (defendant who held clear the exit route while his accomplice shot the victim "consciously rendered . . . aid knowing [the

conduct creating any risk to human life was Aragon's. That risk had already ripened into Flores' death by the time Pulido stumbled into the crime scene. Moreover, Pulido testified that he "knew a person . . . could not withstand a .45 caliber shot to the face." If Pulido did not join the robbery until after Aragon shot Flores, Pulido could not have been subjectively aware that his assistance to Aragon was creating a "grave risk to human life." Consequently, we cannot conclude that the jury stretched its "commonsense understanding" of "reckless indifference to human life" to include Pulido's post-killing participation in the robbery. *Boyde v. California*, 494 U.S. 370, 381 (1990).

2

Pulido seeks to minimize the significance of CALJIC 8.80.1 by deeming it a "general introductory instruction" over which "a specific substantive instruction"—the flawed version of CALJIC 8.81.17—would prevail in the jury's mind. We disagree.

[8] First, the specificity and length of CALJIC 8.80.1 refutes Pulido's assertion that this introductory instruction was prefatory and nonsubstantive.[6] This two-page instruction

---

accomplice's] purpose and intent to commit the robbery and murder"); *People v. Proby*, 70 Cal. Rptr. 706, 710 (Ct. App. 1998) (defendant who supplied his accomplice with a gun before the robbery knew that the accomplice was willing to use violence); *People v. Mora*, 46 Cal. Rptr. 2d 99, 105-06 (Ct. App. 1995) (defendant who planned a home-invasion robbery at night knew that his accomplice would be armed with a rifle).

[6]CALJIC 8.80.1, in its entirety, stated:

> If you find the defendant in this case guilty of murder of the first degree, you must then determine if the following special circumstance is true or not true: that the murder was committed while the defendant was engaged in or was an accomplice in the commission of, attempted commission of, or the immediate flight after committing or attempting to commit robbery.

not only defined the special circumstance, but also set forth the specific requirements for finding the special circumstance if the jury could not determine whether Pulido was the actual killer. It is highly unlikely that the jury would have ignored the text of this detailed instruction merely because it was captioned "SPECIAL CIRCUMSTANCES—*INTRODUC-TORY*." (emphasis added).

Pulido mischaracterizes the content of CALJIC 8.81.17 in an effort to elevate its significance. According to Pulido, CALJIC 8.81.17 "was the substantive instruction *defining* the robbery special circumstance" and contained "the specific rules *governing* the special circumstance introduced in 8.80.1." (second emphasis added). But CALJIC 8.81.17 did

---

The People have the burden of proving the truth of a special circumstance. If you have a reasonable doubt as to whether a special circumstance is true, you must find it to be not true.

If you are satisfied beyond a reasonable doubt that the defendant actually killed a human being, you need not find that the defendant intended to kill in order to find the special circumstances to be true.

If you find that a defendant was not the actual killer of a human being, or if you are unable to decide whether the defendant was the actual killer or an aider and abettor, you cannot find the special circumstance to be true unless you are satisfied beyond a reasonable doubt that the defendant with the intent to kill aided, abetted, counseled, commanded, induced, solicited, requested, or assisted any actor in the commission of the murder in the first degree, or with reckless indifference to human life and as a major participant, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted in the commission of the crime of robbery (Penal Code, s. 190, 2(1)(17) crime) which resulted in the death of a human being, namely Ramon Flores.

In order to find a special circumstance alleged in this case to be true or untrue, you must agree unanimously.

You will state your special finding as to whether the special circumstance is or is not true on the form that will be supplied.

not "define" the special circumstance or "govern" CALJIC 8.80.17. To the contrary, CALJIC 8.81.17 merely provided:

> To find that the special circumstance, referred to in these instructions as murder in the commission of robbery is true, it must be proved:
>
> 1. The murder was committed while the defendant was engaged in the commission or attempted commission of a robbery; or
>
> 2. The murder was committed in order to carry out or advance the commission of the crime of robbery or to facilitate the escape therefrom or to avoid detection. In other words, the special circumstance referred to in these instructions is not established if the robbery was merely incidental to the commission of the murder.[7]

The first sentence, which Pulido points to as "defining" the special circumstance, merely *named* it ("murder in the commission of robbery"). It is the first sentence of CALJIC 8.80.1 which actually *defined* the special circumstance: "[Y]ou must . . . determine if the following special circumstance is true or not true: that the murder was committed while the defendant . . . was an accomplice in the commission of . . . robbery." Furthermore, the body of CALJIC 8.81.17 did not, as Pulido contends, "govern" CALJIC 8.80.1. By its terms, CALJIC 8.81.17 merely set forth an *additional* determination for the jury to make, not an *alternative* one that somehow supplanted CALJIC 8.80.1.

**[9]** The sequence of these instructions also belies Pulido's contention that the jury would have focused on CALJIC

---

[7]As noted above, the district court discovered a typographical error in this instruction, which should have used the word "and" rather than "or" between the two prongs.

8.81.17 to the exclusion of CALJIC 8.80.1. Because CALJIC 8.80.1—the introductory instruction—came first, the jury would have considered it first. If the jury had believed the late-joiner theory, it would not have found the special circumstance based on the introductory instruction because Pulido did not aid and abet the murder with intent to kill, or aid and abet the robbery with reckless indifference and as a major participant. Having already determined that the special circumstance did not apply, there would have been no reason for the jury to consider the next special-circumstance instruction, CALJIC 8.81.17, especially in light of the judge's admonition to "[d]isregard any instruction which applies to facts determined by you not to exist." Therefore, the jury would not have even considered CALJIC 8.81.17, let alone relied on it to convict Pulido on the invalid late-joiner theory.

B

**[10]** We next turn to the special-circumstance verdict form, which stated that "[w]e, the jury . . . , find the special circumstance that [Pulido] engaged in or was an accomplice in the commission of or attempted commission of robbery *during* the commission of the crime charged in count 1 [first-degree murder], to be TRUE." (block capitalization omitted; emphasis added). Although the verdict form correctly sets forth the timing requirement, Pulido nevertheless contends that it failed to ameliorate the instructional errors.

Pulido argues that the language of the verdict form has little significance in the prejudice inquiry because "[i]t is the instructions, not the verdict forms, which state the substantive definitions of the charge." However, given that the prejudice inquiry must encompass "the record as a whole," *Pulido IV*, 129 S. Ct. at 533 n.*, it is entirely appropriate to consider the verdict form in conjunction with the jury instructions and the trial record as a whole, *see Cupp*, 414 U.S. at 147; *cf. Mills v. Maryland*, 486 U.S. 367, 375-76 (1988). The verdict form is especially relevant because "[v]erdict forms are, in essence,

instructions to the jury," *United States v. Reed*, 147 F.3d 1178, 1180 (9th Cir. 1998), and thus in some cases "can cure problems created by defective instructions," *United States v. Alghazouli*, 517 F.3d 1179, 1190 (9th Cir. 2008).

Pulido also argues that the jury would not have assumed that the verdict form contained the authoritative definition of the special circumstance. Therefore, contrary to the plain meaning of the form, the jury would have simply assumed that it encompassed the late-joiner theory. It is implausible, however, that the jury would have cavalierly made this assumption without seeking clarification. During deliberations, the jury "demonstrated that it was not too shy to ask questions, suggesting that it would have asked another" if faced with a verdict form that required it to assume that the word "during" also meant "after." *Weeks v. Angelone*, 528 U.S. 225, 235-36 (2000). We therefore reject the notion of the jury's "extremely gullible acceptance of a result that makes no conceivable sense." *Middleton*, 541 U.S. at 438.

**[11]** Furthermore, the trial record refutes Pulido's assertion that the text of the verdict form was disregarded by the jury. Prior to deliberations, the trial judge read the verdict form to the jury and informed the jury that the form would be available in the jury room for "use in arriving at a verdict." After the jury returned its verdicts, the judge ordered the clerk to read them all aloud and asked the jury "to listen to them because you will be polled and asked if these are your verdicts." The clerk then read the verdicts, including the special-circumstance verdict that Pulido "engaged in or was an accomplice in the commission of or attempted commission of robbery *during* the commission of [murder]." (emphasis added). When polled individually, each juror affirmed that the clerk had read his or her true verdicts. Based on the foregoing, we cannot assume that the verdict form was a practical nullity. *See Humphries v. Dist. of Columbia*, 174 U.S. 190, 194 (1899) (noting that the object of a jury poll "is to ascertain for

a certainty that each of the jurors approves of the verdict *as returned*" (emphasis added)).

C

**[12]** Neither the introductory special-circumstance instruction nor the special-circumstance verdict form was consistent with the late-joiner theory. If the jury had followed the court's instructions using its commonsense understanding of the terms, it would not have based its special-circumstance finding on the late-joiner theory. We therefore conclude that the special-circumstance finding militates in favor of harmlessness.

IV

**[13]** We next consider whether the jury's questions during deliberations reflected any prejudicial effect of the instructional errors.

A

**[14]** During deliberations, the jury asked a series of questions about the meaning of the aiding and abetting and felony murder instructions, CALJIC 3.01 and CALJIC 8.27. No questions were asked, however, about the meaning of either of the special circumstance instructions, CALJIC 8.80.1 and CALJIC 8.80.17.

With respect to aiding and abetting, the jury first asked, "Is 'aiding and abetting' a robbery equivalent to a guilty conclusion on count 2 of (robbery)?" The court answered, "Yes— See attached copy of Instruction 3.01," which defined aiding and abetting, in relevant part, as follows:

> A person aids and abets the commission of a crime when he or she,

    (1)    with knowledge of the purpose of the perpetrator and

    (2)    with the intent or purpose of committing, encouraging, or facilitating the commission of the crime, by act or advice aids, promotes, encourages or instigates the commission of the crime.

The jury also inquired about CALJIC 8.27, the felony-murder instruction,[8] which provided:

> If a human being is killed by any one of several persons engaged in the commission or attempted commission of the crime of robbery, all persons who either directly and actively commit the act constituting such crime, or who with knowledge of the unlawful purpose and with the intent or purpose of committing, encouraging, or facilitating the commission of the offense, aid, promote, encourage or instigate by act or advise its commission, are guilty of murder in the first degree, whether the killing is intentional, unintentional, or accidental.

The jury noted that "Felony homicide defi[ni]tion is unclear to us. . . . Attached are two different interpretations of the meaning of the sentence. Which is correct? A or B[?]" These interpretations, labeled "A" and "B," appeared as follows:

---

[8]As noted above, the felony-murder instruction, read together with the instruction on aiding and abetting robbery, allowed the jury to find Pulido guilty of felony murder as a late joiner. This is because the latter instruction, CALJIC 9.40.1, provided that "[f]or the purpose of determining whether a person is guilty as an aider and abettor to robbery, the commission of the crime of robbery is not confined to a fixed place or a limited period of time and continues so long as the stolen property is being carried away to a place of temporary safety."

*A*
EITHER:
— Actively commit robbery
— Both robbery intended *and* facilitates by aiding

*B*
ANY:
— Actively commit robbery
— Robbery intended
— Facilitate by aiding

In response, the court wrote: "We suggest you reread 8.27 with the definition of aiding and abetting in mind from instruction 3.01."

The jury followed up by asking, "Does point 1 [of CALJIC 3.01] imply that the 'knowledge of the purpose' is knowledge prior to the commission of the crime or during the commission of the crime?" The court responded, "We are unable to answer the question as to an implication of whether 'knowledge of unlawful purpose' must be before or during[.] You should read 3.01 for its plain meaning in relation to all the other instructions bearing on this point."

Finally, the jury asked whether " 'actively commit the act constituting such crime' " and " 'aid *its* commission' " in CALJIC 8.27 referred to the robbery or the murder. The court replied that " 'such crime' refers to *robbery* mentioned in the previous line of instruction 8.27."

B

According to Pulido, these questions indicate that the late-joiner theory "was the central focus" of the jury deliberations. In particular, Pulido points to the questions relating to the "facilitate by aiding" prong of CALJIC 8.27 and the "knowledge of the purpose" prong of CALJIC 3.01.

**[15]** First, Pulido argues that the diagrams the jury drew corresponding to the defective felony-murder instruction, CALJIC 8.27, were intended "to confirm the availability of the invalid theory." *Id.* at 12. However, neither diagram addresses the timing question. The difference between the diagrams is that Diagram B would have incorrectly supported a finding of felony murder if Pulido had merely "facilitate[d] by aiding" without any intent to commit robbery. In other words, the jury appeared to be grappling not with *timing* but rather *intent*, consistent with the duress defense presented at trial. By pointing the jury to CALJIC 3.01, which clearly required both intent *and* assistance under subpart 2, the court effectively invalidated the incorrect diagram. *See Waddington v. Sarausad*, 129 S. Ct. 823, 834 (2009). Furthermore, the guilty verdict on the robbery count confirms that the jury rejected the duress defense and properly found that Pulido had the requisite intent to commit robbery.

Pulido also contends that the question relating to "knowledge of the purpose" in CALJIC 3.01 goes to the crux of the timing issue. As noted above, the jury asked whether "knowledge of the purpose of the perpetrator" must be "knowledge prior to the commission of the crime or during the commission of the crime." According to Pulido, "[t]he answer to the jurors' question should have been a firm, 'Yes': To incur felony-murder liability, a defendant must have knowledge of the perpetrator's purpose and assist in the robbery *before or during* the killing."

Based on the jury's later question whether "such crime" in CALJIC 8.27 referred to the murder or the robbery, it is entirely possible that the "crime" referred to in the question was the killing. But Pulido's reading of the question as one calling for a yes-or-no answer—with "yes" meaning knowledge before or during, and "no" meaning knowledge after—is highly improbable. Read naturally, this is an *either-or* question—must the knowledge be before, or must it be during? If the jury question is taken at face value, it does not

show any reliance on the invalid late-joiner theory, given that *neither* possibility contemplated by the jury is consistent with that theory. *See Pulido I*, 936 P.2d at 729. All this question shows is that the jury was asking whether premeditation was required, which is an entirely different timing question altogether.

## C

**[16]** At most, these jury questions suggest that the jury was uncertain about the application of the *felony-murder* instruction in the context of aiding and abetting. However, there is no indication in the record that the jury imported this uncertainty into its application of the *special-circumstance* instructions. That the jury failed to ask a single question about the meaning of those instructions, notwithstanding the potential internal inconsistency created by the typographical error in CALJIC 8.81.17, indicates that it did not rely on a post-killing aiding-and-abetting theory to convict Pulido.

## V

Finally, we consider whether the evidence in the trial record made it likely that the instructional errors had a substantial and injurious effect on the verdict.

**[17]** Pulido asserts that because there was "substantial evidence that [he] did not join in the robbery until after the shooting," the jury must have relied on the late-joiner theory in convicting him. But most of the evidence cited by Pulido for this proposition—including the neighbor's testimony suggesting the presence of a second person at the crime scene, evidence of Aragon's crack cocaine use (a possible motive for the robbery), and discrepancies in Aragon's alibi statements— merely supports the theory that Aragon was also involved in the crime, and is equally consistent with Pulido's post-killing *and* pre-killing participation. The only evidence that supports

Pulido's theory as to when he joined the robbery, therefore, is Pulido's own uncorroborated testimony.

**[18]** The State presented evidence that Pulido possessed the murder weapon both before and after the robbery. Moreover, Pulido had previously observed that the Shell station would be easy to rob because the attendant was always asleep. Pulido's fingerprints—not Aragon's—were found on the cash register, discrediting Pulido's claim that Aragon had carried it out of the store. While this evidence does not definitively establish when Pulido joined the robbery, one piece of physical evidence, in our view, is sufficient to dispel any doubt as to whether the jury relied on the invalid theory—Pulido's thumbprint on the Coke can found lying on the store counter.

The Coke can corroborated the prosecution's theory that Pulido had used it as a diversion for the robbery, indicating pre-killing participation. Although the defense conceded that the Coke can "is a crucial piece of evidence," Pulido could not explain why his print was on the can. He denied ever touching it that night and speculated that he must have touched it while buying another Coke during a prior visit to the store. Pulido's counsel acknowledged during closing argument that "that's not a good explanation" and suggested that Pulido's testimony about not touching the can was the result of a memory lapse. He could not explain the presence of the print, either.

**[19]** Pulido's late-joiner story was at least the fourth version of the events he had offered and found no support in any evidence other than his own self-serving testimony. Moreover, Pulido could offer only speculation as to how his thumbprint ended up on "a crucial piece of evidence" tying him to the robbery before the murder. Consequently, the record evidence fails to persuade us that the instructional errors caused Pulido any prejudice. *See Morales v. Woodford*, 388 F.3d 1159, 1173 (9th Cir. 2004) ("Mere speculation is insufficient to grant the writ under *Brecht*, because specula-

tion does not give rise to a 'grave doubt' whether the error had a substantial effect in determining the jury's verdict.").

## VI

**[20]** For the foregoing reasons, we can say, "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed" by the instructional errors. *Kotteakos*, 328 U.S. at 765. Because Pulido did not suffer any actual prejudice, he is not entitled to habeas relief. *See Brecht*, 507 U.S. at 637.

Accordingly, the judgment of the district court is

**REVERSED and REMANDED.**

---

THOMAS, Circuit Judge, dissenting:

The question before us on remand is "what effect the error had or reasonably may be taken to have had upon the jury's decision." *McKinney v. Rees*, 993 F.2d 1378, 1385-86 (9th Cir. 1993). Unlike the majority, I cannot confidently conclude that the error did not have a "substantial and injurious effect." *See Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993). Accordingly, I respectfully dissent.

We can rarely say with certainty what effect an error had on a jury's verdict. But here we have the luxury of some certainties. Because the jury hung on the issue of whether Pulido used a gun, we know the jury did not unanimously accept the prosecution's primary theory of the case, which was that Pulido was the shooter. Therefore, we also know that at least some jurors voted to convict on an aiding-and-abetting theory. And it is undisputed that erroneous state court jury instructions permitted the jury to find Pulido guilty of felony murder

on the invalid theory that he formed the intent to aid and abet the underlying felony only after the murder. Indeed, the State concedes both that the state court committed constitutional error in its jury instruction and that the jury found felony murder improperly. Viewing the record as a whole, the undisputed constitutional error was not harmless under *Brecht*. *See Hedgpeth v. Pulido*, 129 S. Ct. 530, 536-37 (2008) (Stevens, Souter, & Ginsburg, JJ., dissenting).

I

A

The trial court's instructions regarding special circumstances did not render the errors in the felony murder instructions non-prejudicial, as they still permitted the jury to find the special circumstance based solely on the theory that Pulido aided and abetted the robbery as a major participant and with reckless indifference to human life. The jury might have found that Pulido was a major participant and acted with reckless indifference based solely on his post-shooting actions.

The Supreme Court has instructed us that a " 'single instruction to the jury may not be judged in artificial isolation but must be viewed in the context of the overall charge.' " *See Middleton v. McNeil*, 541 U.S. 433, 437 (2004) (quoting *Boyde v. California*, 494 U.S. 370, 378 (1990)). But, contrary to the majority's assessment, the constitutionally flawed murder instruction infected other instructions that otherwise would probably have been clear. That infection permitted the jury to make the logical progression from a finding of post-shooting aiding and abetting to a finding of post-shooting murder liability to a finding of post-shooting robbery felony-murder special circumstance.

The trial court specifically instructed the jury that aider-and-abettor liability for robbery "continues so long as the

stolen property is being carried away to a place of temporary safety." CALJIC 9.40.1. Everyone agrees the district court did not instruct the jury that this definition of aider-and-abettor liability attaches only to the robbery count, and that the relevant assistance for felony-murder purposes must begin before or during the robbery and murder. That is part of the constitutional error in this case. Nor was there any reason for the jury to know that this definition was irrelevant to the special-circumstance instructions. To the contrary, the jury had been instructed specifically that it could find special circumstances if "with reckless indifference to human life and as a major participant, [Pulido] *aided*, *abetted*, counseled, commanded, induced, solicited, requested, or assisted in *the commission of the crime of robbery* . . . which resulted in the death of a human being." CALJIC 8.80.1 (emphasis added).

## B

The majority looks to the special-circumstances instruction and reasons the jury could not possibly have concluded that Pulido acted "with reckless indifference to human life and as a major participant, aided, abetted, . . . or assisted" in the robbery. I respectfully disagree.

The California Supreme Court has explained that "the generally accepted meaning of the phrase, 'reckless indifference to human life,' in common parlance . . . conveys to the jury the requirement of a defendant's subjective awareness of the grave risk to human life created by his or her participation in the underlying felony." *People v. Estrada*, 904 P.2d 1197, 1203 (Cal. 1995). The meaning of the phrase is clear enough that it need not be defined for a jury. *See id.* (explaining that the phrase "does not have a technical meaning peculiar to the law"). But it does not require that the prosecution show that the defendant was indifferent to any specific human life. Nor does it add a contemporaneity requirement. Rather, it is typically accompanied by an instruction that the special circumstance only applies if the murder occurred "while" the

defendant was participating in the robbery (again, no such instruction was given here). In turn, the defendant's intent to commit the underlying felony, combined with the general indifference he shows in engaging in the crime in the first place, which both precede the specific homicide, render the defendant culpable for murder.

Absent the contemporaneity requirement typically included in the special circumstance instruction, and in tandem with a prior erroneous instruction that the defendant could be guilty of murder if he did not join a robbery until after the victim had been shot, "reckless indifference to human life" could encompass the act of assisting a convicted felon who is possibly high on crack cocaine drive away from a robbery with a loaded gun, where that person has already shot one person and apparently would not have a problem harming anyone else who stands in the way of his escape. In other words, a juror might have concluded that Pulido was recklessly indifferent to the victim's life, or to human life more broadly, even if he or she believed the victim was already dead before Pulido participated in the robbery.

## C

The majority concludes the jury's uncertainty regarding the felony-murder instructions had no bearing on its understanding of the special-circumstance instructions. The record, however, demonstrates the jury's deep seated confusion as to both the erroneous instructions and the instructions for special circumstances.

The three jury questions reveal that the jurors were struggling with the requirements of aider-and-abettor liability, felony-murder, and the special circumstance robbery-murder. *See, e.g.*, *Shafer v. South Carolina*, 532 U.S. 36, 52-53 (2001) (jury inquiry may provide evidence of jury confusion); *Simmons v. South Carolina*, 512 U.S. 154, 178 (1994) (O'Connor, J., concurring) (same); *Bollenbach v. United*

*States*, 326 U.S. 607, 611-12 (1946) (same). The jury inquired about the meaning of the special circumstance instruction. Indeed, the jury requested "instructions special circumstances for *both* count 1 and count 2." This inquiry demonstrates the jury's confusion, given that the special circumstance does not attach to either count, but rather is intended to be a special finding of contemporaneity between the two counts. This question is especially important given the State's argument that the special circumstance finding implicitly incorporated a finding of contemporaneity.

The jury's question of whether aider-and-abettor liability requires "knowledge [of the purpose of the perpetrator] prior to the commission of the crime or during the commission of the crime" demonstrates that some jurors were confused as to the timing requirements for aider-and-abettor liability. That is, they were unsure whether Pulido could be found guilty on an aider-and-abettor theory if he became aware of the principal's purpose only during or after commission of the crime. This question is especially important because the jury was permitted to find special circumstances based on an aider-and-abettor theory, and, as it was instructed, aider-and-abettor liability "continues so long as the stolen property is being carried away." The jury's question as to whether it could find felony murder based solely on actual "facilitat[ing] by aiding," or whether it must also find that Pulido intended for the robbery to occur, also demonstrates that at least some jurors believed that Pulido might have developed knowledge and intent only after the actual theft had occurred.

Important to the question of prejudice, the judge did not answer any of those questions directly. Instead, he merely referred the jurors back to their flawed and inconsistent instructions. The fact that the jury did not continue to ask for clarification does not imply it needed no more help. *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000) ("Given that petitioner's jury was adequately instructed, and given that the trial judge responded to the jury's question by directing its

attention to the precise paragraph of the constitutionally adequate instruction that answers its inquiry, the question becomes whether the Constitution requires anything more."); *Morris*, 273 F.3d at 842 ("Also unpersuasive is the argument that, because the jury asked for only a general explanation of special instruction 60, there is no way to be sure what the jury was confused about.").

The majority's rationale implies this is a case of a technical error requiring only a technical fix. Not so. The instruction for murder was patently incorrect. The jury repeatedly expressed its confusion to the presiding judge who responded to the jury's notes without clarifying the question of timing adequately. Its questions refute the argument that the jury understood and applied the contemporaneity requirement that was formally included in the verdict form. It is not only possible but probable that the jurors were confused as to the timing and intent requirements in the felony-murder and special circumstance instructions.[1]

The majority maintains that the use of the word "during" in the special-circumstance verdict form ameliorates any error.[2]

---

[1]The State argues that it is not reasonably probable that the jury used a post-killing aiding and abetting theory to reach the special circumstance finding. This is a slight misstatement of the *Brecht* standard. In the face of conflicting evidence and testimony, jurors do not necessarily decide 'what happened' or reach a verdict based on one single narrative of events that they accept as true. *See, e.g.,* CALJIC 8.80.1 (instructing jury in case it is "unable to decide whether the defendant was the actual killer or an aider-and-abettor"). In contemplating different possible scenarios, a jury may find beyond a reasonable doubt that, whatever happened, it fitted into the broad definition of the crime with which the defendant has been charged. The question is not whether some jurors determined that Pulido definitely did not form the intent to join the robbery until after the clerk was killed, but rather how likely it is that they harbored some reasonable alternative theories about the timing, theories which, if properly instructed, they would have known were actually reasonable doubts about Pulido's guilt of felony murder.

[2]The special-circumstance verdict read that Pulido "engaged in or was an accomplice of or attempted commission of robbery *during* the commission of [murder]."

But the assumption that this isolated reference to contemporaneity somehow eclipses both the admitted constitutional error and the manifest jury confusion violates the very rationale that the majority relies upon—"[W]e accept at the outset the well established proposition that a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Cupp v. Naughten*, 414 U.S. 141, 146-47 (1973).

D

The majority agrees with the State that the evidence does not support Pulido's theory of the case. In particular, the majority suggests the fingerprint found on the Coke can is fatal to Pulido's prejudice argument and that Pulido did not articulate a satisfactory explanation for the presence of the fingerprints on the can.

While it is true that the most plausible explanation for the presence of the fingerprint is that Pulido brought it to the counter as a distraction before the theft and shooting, it is not the only plausible explanation. That a defense attorney may limit the number of theories he proposes does not in turn limit the jury's ability to consider plausible alternate explanations —such as the possibility that Pulido moved the Coke can, which was on the counter, when he went to grab the cash register, which presumably was also on the counter, and upon which Pulido's fingerprints were also discovered.

Moreover, the jury's third question—whether it could find felony murder based solely on actual "facilitat[ing] by aiding," or whether it must also find that Pulido intended for the robbery to occur—clearly indicates that at least some jurors had reasonable doubts about the State's proffered explanation for the fingerprint. If the jury had accepted the prosecutor's explanation, that Pulido brought the Coke can to the counter as a distraction, it would almost certainly have concluded that Pulido actually intended for the robbery to occur. If Pulido

were inside the store during the robbery but did not know his uncle's plans in advance, however, and Aragon took advantage of the distraction that Pulido incidentally provided when he actually attempted to purchase the Coke, then Pulido would arguably have facilitated the robbery by helping his uncle, without actually intending for the robbery to occur.

Similarly, the State argues that, if the jury believed Pulido carried out the cash register voluntarily, he must have been aiding and abetting the robbery from the beginning. It is certainly plausible, however, that Pulido—a sixteen year old boy who owned a gun, who was to steal a car two weeks later, and who lived with an uncle with a criminal record and a possible crack cocaine addiction, *Pulido*, 2005 WL 6142229, at *1-*3 —heard the gun shot, realized that his uncle was holding up the gas station, and decided to help.

Jurors are not required to accept one or another proffered explanation of the evidence, but rather are called upon to weigh and evaluate the evidence for themselves in light of the law as explained to them by the court. In this case, the law was explained improperly, and I cannot reasonably conclude that the error did not substantially and injuriously effect the verdict.

## II

The instructions allowed for a conviction for felony-murder and a finding of special circumstance robbery-murder even if Pulido became a knowing participant only after the robbery and shooting were completed. The jurors' questions suggest that at least one juror would have voted to acquit Pulido of felony-murder and special-circumstance charges if the jury had been properly instructed that contemporaneity was a necessary finding. Like the district court, the record in this case leaves me with "grave doubt" as to whether the erroneous instructions had a substantial and injurious effect on the jury's verdict.

Accordingly, I respectfully dissent.