UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| RICHARD RAYMOND TUITE, | No. 09-56267 |
| Petitioner - Appellant, | D.C. No. 3:08-cv-01101-J-CAB |
| v. | Southern District of California, San Diego |
| MICHAEL MARTEL, Warden, | |
| Respondent - Appellee. | ORDER |

Before: NOONAN, BERZON, and CALLAHAN, Circuit Judges.

The memorandum disposition filed on September 8, 2011 is hereby withdrawn. A new disposition will be filed.

The majority of the panel votes to deny the petition for rehearing. Judge Callahan votes to grant the petition for rehearing. Judge Berzon votes to deny petition for rehearing en banc and Judge Noonan recommends denying the petition for rehearing en banc. Judge Callahan votes to grant the petition for rehearing en banc.

The full court has been advised of the petition for rehearing en banc, and no judge of the court has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

The petition for rehearing is DENIED and the petition for rehearing en banc is DENIED.

No further petitions for rehearing and for rehearing en banc will be entertained.

**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| RICHARD RAYMOND TUITE, | No. 09-56267 |
| Petitioner - Appellant, | D.C. No. 3:08-cv-01101-J-CAB |
| v. | |
| MICHAEL MARTEL, Warden, | MEMORANDUM[*] |
| Respondent - Appellee. | |

Appeal from the United States District Court
for the Southern District of California
Napoleon A. Jones, District Judge, Presiding

Argued and Submitted December 9, 2010
Pasadena, California

Before: NOONAN, BERZON, and CALLAHAN, Circuit Judges.

Richard Raymond Tuite appeals the denial of his petition for a writ of

habeas corpus. Applying *Brecht v. Abrahamson*, 507 U.S. 619 (1993), and holding

that there is at least "grave doubt" as to whether the confrontation clause error at

---

[*]    This disposition is not appropriate for publication and is not precedent
except as provided by 9th Cir. R. 36-3. The panel finds that a published opinion
might cast unjust aspersions upon those not before the court.

issue had a substantial and injurious effect or influence on the verdict, we reverse and remand.  *See Pulido v. Chrones*, 629 F.3d 1007, 1012 (9th Cir. 2010).

FACTS AND PROCEEDINGS

On January 20, 1998, Stephanie Crowe, aged twelve, was stabbed nine times by knife in her own bed in her own bedroom.  She had been on the phone about 10 p.m. and died before midnight.  Her body was discovered by her grandmother about 6 a.m., the next day.

Within two weeks of her death, the Escondido police had identified three teenage boys as suspects, had interrogated them, and had obtained confessions.  On May 22, 1998, these suspects were indicted for Stephanie's murder.  The district attorney of San Diego County prepared the case for trial, calling on an F.B.I. expert, Mary Ellen O'Toole, for help in developing the case.  But in February 1999, the state Attorney General dismissed the indictments without prejudice.  This court recently reversed the dismissal of a § 1983 lawsuit brought by the former suspects against the investigating police officers, so that case is going forward.  *See Crowe v. County of San Diego*, 608 F.3d 406 (9th Cir. 2010).

Here, however, we consider only the record as it developed in Tuite's criminal trial.  That record shows that the day after Stephanie's death, the police picked up Tuite, an itinerant known to have been as close as one quarter of a mile

2

to the Crowe house at one point on the fatal evening. They took hair samples and fingernail scrapings, photographed him and impounded some of his clothes, in particular a red turtleneck shirt and a white T-shirt. These items were examined on April 28, 1998 for bloodstains. Wetting the red shirt completely and using a fluoroscopic process, the police found no blood on the red shirt. The red shirt was subsequently photographed using a tripod that had previously been used at the scene of the crime without using protective coverings for the legs so as to avoid contamination. The white T-shirt had visible bloodstains and was sent to a laboratory for DNA testing. The test excluded Stephanie as the donor. Search of the Crowe house found no physical evidence of Tuite ever having been there.

Tuite was a mentally deficient person, without known employment or home, who had been living in the San Diego area. On the evening of January 20, he had bothered three residences as he sought "the girl" or "Tracy." After Stephanie's death, he continued this quest during the rest of January, February and March 1998. Sometimes he annoyed residents enough that they called the police. On no occasion was he violent or did he use a weapon.

The San Diego District Attorney recused himself. The state Attorney General took over the case. In May 2002, the Attorney General obtained the indictment of Tuite for murder in the first degree.

At trial, the state presented evidence that a criminologist in 1999 had retested the red shirt worn by Tuite and found Stephanie's DNA in a stain on it; in April 2003, a second criminologist had retested Tuite's white T-shirt and found her DNA on it. The defense countered these reports with expert testimony that the police could have inadvertently contaminated the shirts while they were in their custody as they investigated the case. O'Toole, the F.B.I. expert first retained by the district attorney to prosecute the boys, testified for the defense that in her judgment "the crime scene" reflected organization, that is, control of the victim and of surrounding events and circumstances so that the murder could be brought off without alarming the family members sleeping nearby, and without the murderer leaving fingerprints or the murder weapon. The prosecution rebutted O'Toole with its last witness, Gregg O. McCrary, who had been an agent of the F.B.I. for nearly thirty years, and was now in the business of consulting on criminal behavior. He testified that the crime scene was, on the whole, "disorganized," reflecting a random attack.

The defense moved to impeach McCrary by cross-examining him on a letter he had written, attacking O'Toole's analysis of the crime scene, accusing her of undermining the prosecution of this case, suggesting that she had acted unethically, and expressing a strong desire that O'Toole be persuaded not to testify at Tuite's

4

trial.  After a hearing outside the presence of the jury, the court excluded the letter and cross-examination based on the letter.

McCrary's excluded letter, dated February 24, 2004, was written to the International Criminal Investigative Analysis Fellowship (ICIAF) about O'Toole's proposed testimony for the defense, and what he termed "ethical issue[s]" that testimony raised.  He wrote that Tuite was the "true killer," and that he was hopeful O'Toole would not testify.  He went on:

> Neither the San Diego County Sheriff's Office nor the Office of the Attorney General for the State of California has requested the assistance of the NCAVC [National Center for the Analysis of Violent Crime] or the ICIAF in this matter.  *Both agencies are shocked and dismayed* that Mary Ellen O'Toole, a representative of both the FBI and [the] ICIAF, has injected herself into this case in what *they view as an attempt to obstruct justice and undermine the successful prosecution* of Richard Tuite.

(emphasis added).  At the hearing, McCrary admitted that he had not spoken to anyone from the Sheriff's Office.  He also admitted that no one had accused O'Toole of obstructing justice or undermining Tuite's prosecution.

A jury found Tuite guilty of manslaughter.  The court sentenced him to thirteen years imprisonment.  He appealed to the California Court of Appeal for the Fourth District, which found that the trial court had committed constitutional error in excluding McCrary's letter and cross-examination on it, but held the error to be

5

harmless and affirmed. The Supreme Court of California denied review. The

federal district court denied Tuite's petition for habeas.

Tuite's appeal to us focuses on the California's court's ruling of

harmlessness. That court held:

> Under the above-stated legal principles, we agree Tuite's
> counsel should have been allowed to cross-examine McCrary about
> his February 24, 2004 letter, and the trial court violated Tuite's
> constitutional right to confront adverse witnesses when it precluded
> such cross-examination.
>
> The letter was relevant because it demonstrated bias and impacted
> McCrary's credibility in a manner that could lead a reasonable jury to
> question the reliability and validity of his testimony. (*See* Evid. Code,
> §§ 210, 780, subd. (f).) The letter bore directly on McCrary's
> credibility and reliability by indicating McCrary had a personal
> interest in convicting Tuite, whom he referred to as "the true killer."
> The letter also demonstrated McCrary had prejudged Tuite's case and
> was acting more as an advocate for the prosecution than as a forensic
> expert. Moreover, McCrary's unusual attempt to dissuade O'Toole
> from testifying revealed a bias in favor of the prosecution and a bias
> against O'Toole. The letter also revealed McCrary's tendency to
> exaggerate; his statement that the sheriff's office and the prosecuting
> agency viewed O'Toole as obstructing justice was not only a gross
> overstatement but was also unreliable because no one from the
> sheriff's office had talked to him about O'Toole's upcoming
> testimony. For all these reasons, it is likely that a reasonable jury
> would have received "a significantly different impression of [the
> witness's] credibility had [the excluded cross-examination] been
> permitted." (*Delaware v. Van Arsdall, supra*, 475 U.S. at p. 680).

Nonetheless, the court of appeal held this constitutional error to be harmless

beyond a reasonable doubt.

6

The court of appeal weighed the harm of the constitutional error. It held that the jury itself was informed of the elements making up "the crime scene"; the jury was not dependent on the experts in determining whether the crime scene was organized or disorganized. The court of appeal added: "Further, the error in excluding McCrary's letter had no impact on the central evidence against Tuite – the DNA evidence that Tuite had Stephanie's blood on his clothing."

In assessing the harmlessness of the constitutional error, however, the court of appeal left out of the account these considerations: (1) the improbability of the prosecution's case – namely, that a stranger could enter a house he did not know without leaving any signs of forced entry, make his way to a bedroom occupied by a girl without being seen or heard by the five other family members in the house, be moved to kill a girl he did not know, and depart from the house leaving no trace of any kind of his having been there to commit a motiveless murder; (2) the lack of explanation regarding how Tuite could have entered or exited the home, given the fact that the door commonly used to enter and exit the home was found deadbolted from the inside the morning after the murder, and the other doors did not appear to have been used to enter or exit the house; (3) the jury's view of the evidence as shown by the length of deliberations and the jury's reported deadlock after a week of deliberation; (4) the jury's compromise verdict of voluntary manslaughter rather

7

than murder, reached after another week of deliberation, a verdict virtually impossible to square with the evidence of a series of deliberate knife wounds inflicted on a helpless victim. The court of appeal did note the strength of the DNA evidence. But if that evidence had been seen as dispositive, the jury would neither have reported deadlock nor compromised in reaching a manslaughter verdict in a case in which the victim was stabbed nine times with a knife. In fact, members of the jury could well have regarded the DNA evidence as not entirely persuasive, given the contradictions between the earlier and later test results and the alternative, contamination explanation offered by the defense. *No* view of the evidence was advanced by the prosecutor *or* by the defense that would have justified mitigating murder, deliberately inflicted on a defenseless child, into a manslaughter conviction. Only a deeply-divided jury could have reached a compromise agreement of that sort.

All these factors increase the likelihood that the Confrontation Clause error with regard to the expert testimony had a substantial and injurious effect on the verdict. Moreover, the court ignored the weight that McCrary's testimony likely carried, given its strategic presentation. Coming at the end of a long trial, McCrary was presented by the prosecution as an essential rebuttal witness to O'Toole. He was her superior in experience and in his past position at the F.B.I. He was a

8

government witness no longer in government, speaking with apparent impartiality on his speciality while in government. Absent some reason not to do so, the jury would trust his honest evaluation of the scene. To establish that he was jealous and resentful of O'Toole, that he was seeking to dissuade her from testifying by sullying her reputation, that he had developed a personal interest in the case, and that he was willing to misrepresent the stance of two governmental agencies to maintain his position was to destroy the impartial, measured image of him presented by the prosecution.

Without that evidence in the record, the prosecution was able to emphasize that McCrary was providing his testimony for free, so he had no motive to lie:

> But really interesting, it was fascinating to me, Gregg Mc Crary was criticized by the defense for coming into this courtroom and sharing with you his knowledge, his experience, his expertise and not charging us for it; while at the same time, Dr. Leo comes in and testifies and charges for it and he gets hammered for charging for it. What is it? Which is it? You do it for free, you got to be a creep; if you do it for money, you're still bad, evil.

> You know, Gregg Mc Crary explained to you when he testified here he does things sometimes pro bono, for no charge, to the extent that he can. He does have to pay for a mortgage and he does have children and a family and obviously expenses. And I would submit to you that Gregg Mc Crary when he testified in this case was completely credible, it was an honor to have him in the courtroom, it was an honor to have him share his knowledge with us, and it was a courageous thing for him to do. He is a lifetime F.B.I. agent.

9

Having promoted him to "lifetime F.B.I. agent," the prosecution emphasized

McCrary's independence and integrity and lack of personal animus in challenging

O'Toole:

> Why would he be willing to do that? Because he could see how
> honestly wrong and inaccurate Ms. O'Toole was.
>    It was courageous for him to do that. And for him to be
> criticized for not charging the prosecution, I feel like calling the
> Attorney General's Office, calling Attorney General, or calling the
> Governor and saying, you know, I know we don't have that much
> money, but isn't it nice we got Mr. Mc Crary to testify and not charge.

The prosecutor returned to attack O'Toole and to praise McCrary:

> I want to stay on the subject of means for a second. Let's talk
> about crime scene assessment. There were two witnesses; the defense
> called. Mary Ellen O'Toole and we called Gregg Mc Crary.

> And you recall Mr. Mc Crary described to you his experience
> with the F.B.I. and crime scene assessment, had I would say
> phenomenal, extensive, international, the number of cases he's been
> involved with, the number of crime scene assessments he's been
> involved with, and the number of times that he has testified.

> Ms. O'Toole doesn't have the benefit of that, of that
> experience. And I would submit to you that it was reflected in the
> work done and the conclusions drawn.

> If you recall, Gregg Mc Crary said for a crime scene assessment
> to be done, there are four things that you look at in combination. The
> four things are: all of the evidence, and we'll talk about that in a
> second, victimology, the crime scene location, and suspect evidence.

> And he said something that I did think really kind of stands out;
> that is, if any one of those is ignored, then the findings become then

10

unreliable. And unfortunately, that is what Ms. O'Toole did. She ignored evidence in the evidence prong, if you will, and she ignored all of the suspect information. As a result, her findings were, honestly, flat-out inaccurate. As we were going through her findings, undoubtedly, as you were seated there, you probably were thinking, well, that is wrong, that is not true. You know organized versus disorganized. When you see the crime scene itself, there is nothing about the crime scene that is organized at all.

And then luckily, Mr. Mc Crary can describe for you what an organized crime scene is, was actually involved in doing an organized case. It is not reflected in this case whatsoever.

One of the things that stood out, I think, in Mr. Mc Crary's testimony is simply the reality of it as he is touching on different factors. And, you know, we asked – asked him, well, you know, does luck have anything to do with basically in the commission of a crime? Oh yeah, of course it does. And you know in real life it does; good luck, bad luck, always has some – some play of what is going on. In this case there is a ton of both. Depends on who you are and which way you see it. With regard to, for example, Stephanie, it was all bad luck completely.

In contrast to the prosecutor's argument, as the California Court of Appeal recognized, "[t]he letter bore directly on McCrary's credibility and reliability"; it showed that "McCrary had a personal interest in convicting Tuite"; that McCrary's own letter showed that he "was acting more as an advocate for the prosecution than as a forensic witness." His own letter "could lead a reasonable jury to question the reliability and validity of his testimony." Moreover, the letter actually contained unsubstantiated accusations – that the San Diego Sheriff's office and the office of

11

the Attorney General of California viewed O'Toole as "injecting herself into this case" in "an attempt to obstruct justice." These were accusations made up by McCrary without foundation in fact. These accusations revealed a witness with a passionate animus against O'Toole. Cross examination on the letter would have significantly undermined his credibility to the jury.

Given the lack of evidence tying Tuite to the crime, the problems with the DNA evidence, the jury's deadlock and compromise verdict, and the weight and strategic position of McCrary's testimony, this case is one of those "unusual" circumstances in which we find ourselves "in virtual equipose as to the harmlessness of the error." *O'Neal v. McAninch*, 513 U.S. 432, 435 (1995). We must treat the error as affecting the verdict, and are compelled to grant the writ. *Id.*

The state argues that, instead of or in addition to our analysis under *Brecht* concerning whether the confrontation clause error caused actual prejudice, AEDPA requires us to analyze whether the state appellate court's determination was unreasonable under *Chapman v. California*, 386 U.S. 18 (1967), again asking if the confrontation clause error was harmless beyond a reasonable doubt. In other words, the state, persistently and passionately, asks us to apply a standard of review less favorable to the state than the one we have employed. As the Supreme Court has recognized, the *Brecht* standard "obviously subsumes" "the more liberal

12

AEDPA/*Chapman* standard." *Fry v. Plyler*, 551 U.S. 112, 120 (2007). Therefore, "it certainly makes no sense to require formal application of *both* tests." *Id.* We note that -- as *Fry* predicts -- were we to apply the AEDPA/*Chapman* standard, we would conclude, for the same reasons stated in the text with regard to the *Brecht* standard, that the state court *Chapman* harmless error ruling was unreasonable.

For the foregoing reason, the judgment of the district court is REVERSED and REMANDED with instruction to issue a conditional writ of habeas corpus.

*Tuite v. Martel*, No. 09-56267

CALLAHAN, Circuit Judge, dissenting:

Tuite is entitled to habeas relief only if the error had a substantial, injurious effect on the verdict. *Slovik v. Yates*, 556 F.3d 747, 755 (9th Cir. 2009). Because the excluded cross-examination would likely have discredited both the prosecution's and defense's experts, and would have proven relatively unimportant in light of the other evidence at trial, I would affirm the denial of habeas relief.

In assessing the effect of the error on the verdict, we assume that the damaging potential of the cross-examination would have been fully realized. *Id.* As the state court described, the cross-examination would have revealed McCrary's strong personal bias toward the prosecution and against O'Toole, his belief that Tuite was guilty, and his ability to exaggerate.

However, the potential damage cut both ways. O'Toole's own credibility likely would have been sullied. In a cross-examination outside the jury's presence, McCrary explained that O'Toole's report of the crime had been "pulled" and that he had prepared the letter at someone else's request for an ethics investigation. The jury might also have been influenced by McCrary's assessment of Tuite's guilt, given McCrary's vast investigative experience.

Additionally, in assessing the error's effect we consider (1) the testimony's

1

importance; (2) whether it was cumulative; (3) whether there was evidence that corroborated or contradicted the testimony's material points; (4) the extent of cross-examination allowed; and (5) the full strength of the prosecution's case. *Id.*

1.  The dueling testimony was relatively unimportant to both sides, in light of the other evidence. As Tuite conceded, the DNA evidence was the strongest aspect of the prosecution's case. The prosecution only used McCrary to rebut O'Toole's testimony concerning whether the crime was organized.

The defense's case was directed toward establishing that the original suspects killed Stephanie. Most important to the defense's case were the video and audiotapes of the suspects' inculpating statements during their interrogations by the police.

In addition to O'Toole's testimony, the defense put on an expert who testified that the nature of the attack suggested more than one attacker. Moreover, the defense put on an expert who testified that after 600 hours of investigation, he had found nothing placing Tuite inside the house.

2.  Although McCrary's testimony was not cumulative of other testimony in favor of the prosecution, this factor is outweighed by the other factors that all suggest the error did not substantially affect the verdict.

3.  The jury could assess for itself whether the extensive crime scene

2

evidence corroborated McCrary's or O'Toole's analysis.

4. Although the defense was prevented from fully exploring McCrary's bias based on the letter, it was able to establish McCrary's general bias for the prosecution as a paid witness. Further, defense counsel skillfully challenged McCrary's interpretation of various crime scene factors and his final assessment that the crime scene was disorganized.

5. Despite the improbabilities of the commission of the crime, the prosecution had a workable theory on how it was done, and showed that Tuite was bold and irrational in his hunt for a girl on the night of the murder. Tuite had approached several homes looking for a "girl," who he later declared he wanted to "kill." Tuite had opened the front door of one of the homes. He was last seen that night heading up the road leading to Stephanie's house, which was the only home on that part of the road. The prosecution showed that he could have entered through the laundry room door and left through one of two different doors.[1] Further, although family members heard pounding in the house around the time of the murder, and Stephanie's mother woke up and realized that her bedroom door was opened and shut, none of the family members investigated the noises.

---

[1] Tuite's ability to slip through the unfamiliar house seems less improbable in light of his wily escape from handcuffs and the courtroom holding tank during trial, which ended with his apprehension hours later in another town.

3

The jury was also presented with evidence placing Tuite in the house. Stephanie's DNA was found on the shirt Tuite wore that night. Investigators found a wrapper from an uncommon cough drop and a torn Snickers bar wrapper in Tuite's pockets, and found wrappers from the same cough drops and a torn Snickers wrapper in Stephanie's room. Moreover, although the investigators did not find a knife on Tuite when he was detained the day after the murder, the jury received evidence that Tuite was found with a knife on three prior occasions.

The DNA evidence was the strongest aspect of the prosecution's case, although it was disputed. During its lengthy deliberations, the jury requested read backs of DNA testimony, but not the testimony at issue.

In light of these considerations, I am convinced that the limitation on cross-examination did not have a substantial and injurious effect on the jury's verdict. Thus, I would affirm the denial of habeas relief.