CALLAHAN, Circuit Judge,
dissenting:
In 1985, Hector Juan Ayala shot and killed three men. In 1989, he was convicted on three counts of murder, and the jury returned a verdict of death. On direct appeal his conviction and sentence were affirmed by the California Supreme Court in 2000. People v. Ayala, 24 Cal.4th 243, 99 Cal.Rptr.2d 532, 6 P.3d 193 (2000). The Supreme Court of the United States denied his petition for certiorari in 2001. Ayala v. California, 532 U.S. 908, 121 S.Ct. 1235, 149 L.Ed.2d 143 (2001). Ayala filed his initial petition for a writ of habeas corpus in the United States District Court for the Southern District of California in 2002. This appeal is from the district court’s February 17, 2009, final order denying the petition.
The majority holds, based primarily on law developed after Ayala’s trial, that Ayala must be released or retried because it cannot tell whether the prosecutor in recusing seven jurors might have had a ra *974 cial motive for doing so. It does so by extending each supporting argument just slightly beyond its limitations, in order to reach a conclusion that appears reasonable but nonetheless does not withstand scrutiny. The majority reaches its goal by ruling that Ayala’s primary argument is not Teague-barred, creating an unreasonable standard for reviewing ancient alleged Batson violations, and refusing to give the California Supreme Court’s findings the deference that several recent United States Supreme Court opinions require. In essence, the majority holds that because the record does not affirmatively negate the existence of a possible racial bias, the existence of such a bias may be assumed. Under this approach all Batson challenges in federal habeas petitions must be granted because no one can disprove a negative. The Supreme Court has clearly rejected such a standard and accordingly, I dissent.
I
In Batson v. Kentucky, 476 U.S. 79, 96, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the Supreme Court held “a defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor’s exercise of peremptory challenges at the defendant’s trial.” See also Georgia v. McCollum, 505 U.S. 42, 47, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992). Batson established a three-step inquiry. First, the defendant must make a prima facie showing that the prosecution has exercised peremptory challenges in a racially discriminatory manner. Batson, 476 U.S. at 96, 106 S.Ct. 1712. The Supreme Court stated that it had “confidence that trial judges, experienced in supervising voir dire, will be able to decide if the circumstances concerning the prosecutor’s use of peremptory challenges creates a prima facie case of discrimination against black jurors.” Id. at 97, 106 S.Ct. 1712. Second, “[o]nce the defendant makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation for challenging black jurors.” Id. Third, the trial court must then “determine if the defendant has established purposeful discrimination.” Id. at 98, 106 S.Ct. 1712.
In setting forth this three-step standard, the Supreme Court specifically declined “to formulate particular procedures to be followed upon a defendant’s timely objection to a prosecutor’s challenges.” Id. at 99, 106 S.Ct. 1712. The Court reiterated that “[i]n light of the variety of jury selection practices followed in our state and federal trial courts, we make no attempt to instruct these courts how best to implement our holding today.” Id. at 99 n. 24, 106 S.Ct. 1712. As a result, during the quarter of a century that has passed since Batson, courts have considered numerous ways of applying Batson’s three-step standard.
Ayala’s primary argument is that the exclusion of him and his counsel from the proceedings in which the prosecution justified its recusal of seven jurors violated his constitutional rights to assistance of counsel at critical stages of the proceedings, to be personally present, and to assist his counsel in his defense. In response, the State argued and the district court held that in 2001, when Ayala’s conviction became final, the exclusion of Ayala and his counsel from the proceedings had not been established as a constitutional violation, and hence, was barred by Teague v. Lane, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989).
The California Supreme Court in reviewing Ayala’s direct appeal concluded that it was “almost universally recognized that ex parte proceedings following a motion regarding peremptory challenges allegedly made on the basis of improper group bias are poor procedure and should *975 not be conducted unless compelling reasons justify them.” Ayala, 99 Cal.Rptr.2d 532, 6 P.3d at 203. However, in Horn v. Banks, 536 U.S. 266, 272, 122 S.Ct. 2147, 153 L.Ed.2d 301 (2002), the Supreme Court held that “a federal court considering a habeas petition must conduct a threshold Teague analysis when the issue is properly raised by the state,” even if the state supreme court did not consider the issue.
In Caspari v. Bohlen, 510 U.S. 383, 114 S.Ct. 948, 127 L.Ed.2d 236 (1994), the Supreme Court set forth the test for determining whether a claim was Teague barred:
“[A] case announces a new rule if the result was not dictated by precedent existing at the time the defendant’s conviction became final.” Teague v. Lane, supra, 489 U.S. at 301 [109 S.Ct. 1060]. In determining whether a state prisoner is entitled to habeas relief, a federal court should apply Teague by proceeding in three steps. First, the court must ascertain the date on which the defendant’s conviction and sentence became final for Teague purposes. Second, the court must “[s]urve[y] the legal landscape as it then existed,” Graham v. Collins, supra, 506 U.S., at 468 [113 S.Ct. 892], and “determine whether a state court considering [the defendant’s] claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule [he] seeks was required by the Constitution,” Saffle v. Parks, 494 U.S. 484, 488 [110 S.Ct. 1257, 108 L.Ed.2d 415] (1990). Finally, even if the court determines that the defendant seeks the benefit of a new rule, the court must decide whether that rule falls within one of the two narrow exceptions to the nonretroactivity principle. See Gilmore v. Taylor, 508 U.S. 333, 345 [113 S.Ct. 2112, 124 L.Ed.2d 306] (1993).
Id. at 390, 114 S.Ct. 948(emphasis as quoted in Caspari, parallel cites removed). There is no dispute that Ayala’s conviction became final in May 2001, when the Supreme Court denied certiorari, and Ayala does not assert that he comes within either of the two narrow exceptions. Thus, the question presented is whether in May 2001, the unconstitutionality of ex parte procedure used by the trial court in 1986 was “dictated” by precedent.
The majority claims that in May 2001 this rule had been “unequivocally ‘dictated by precedent’ ” as a result of our opinion in United States v. Thompson, 827 F.2d 1254 (9th Cir.1987). Thompson, however, did not announce a clear constitutional rule, and furthermore, the majority confuses what it sees as the wisdom of Thompson with the question of whether that wisdom had been embraced by 2001.
Thompson concerned a 1985 criminal trial in a federal district court. The judge alone conducted voir dire and “the government used four of its peremptory challenges to exclude all four blacks in the venire.” Id. at 1256. When “Thompson’s lawyer moved for a mistrial,” the district court “allowed the government to put its reasons for the disputed peremptory challenges on the record, albeit in camera and out of the presence of the defendant and his lawyer.” Id. Thompson appealed arguing that this procedure violated his Fifth Amendment right to due process and his Sixth Amendment right to a fair and impartial jury. Id. We concluded that the “district court erred in refusing to allow defense counsel in this case to hear the government’s reasons for excluding the black potential jurors and to present argument thereon.” Id. at 1261. We explained that “situations where the court acts with the benefit of only one side’s presentation are uneasy compromises with some overriding necessity, such as the need to act *976 quickly or to keep sensitive information from the opposing party. Absent such compelling justification, ex parte proceedings are anathema in our system of justice and, in the context of a criminal trial, may amount to a denial of due process.” Id. at 1258-59.
Although the logic behind the opinion in Thompson may be compelling, the opinion nonetheless does not dictate a constitutional standard. It concerned a federal court trial, not a state court trial.[1] It was not a unanimous opinion and the dissent argued that the majority’s choice of an adversarial proceeding over an in camera proceeding was contrary to the Supreme Court’s decision in Batson not to formulate particular procedures. Id. at 1262 (Sneed, J., dissenting). Moreover, although Thompson held that the district court in the case before it had erred as a matter of constitutional law, it did not set forth a binding rule. The opinion recognized that there were “occasional departures from” the norm of holding adversarial proceedings, noted a number of instances in which in camera proceedings were appropriate, and concluded that departure from the norm “may amount to a denial of due process.” Id. at 1258-59 (emphasis added). The language in Thompson is clearly advisory when compared to our statement in Menefield v. Borg, 881 F.2d 696, 699 (9th Cir.1989) that “we hold that the right to counsel attaches to the motion for a new trial stage.”[2]
The cautionary, rather than binding, nature of Thompson is confirmed by a review of other Ninth Circuit cases as well as decisions by our sister circuits. In Lewis v. Lewis, 321 F.3d 824, 831 n. 27 (9th Cir.2003), we observed that “[cjertainly, requiring a court to allow defense counsel to argue [during the three-step Batson process] is not clearly established law.” In Majid v. Portuondo, 428 F.3d 112 (2d Cir.2005), the Second Circuit commented that “[i]t remains at least arguable that courts holding Batson hearings may, to the contrary, hear the explanations in camera and outside the presence of the defendants.” Id. at 128 (citations omitted). In United States v. Tucker, 836 F.2d 334, 340 (7th Cir.1988), the Seventh Circuit noted that the Supreme Court in Batson expressly declined to formulate procedures and disagreed with the Ninth Circuit’s opinion in Thompson insofar as it required an “adversarial hearing once a defendant establishes a prima facie case of purposeful discrimination.” Similarly, in United States v. Davis, 809 F.2d 1194, 1202 (6th Cir.1987), the Sixth Circuit commented that Batson does not “require the participation of defense counsel while the Government’s explanations are being proffered.”
The majority strives mightily to distinguish these comments on the grounds that they are not well-reasoned, in some instances are merely dicta, and have been *977 rejected by other circuits and most state courts. But the standard established by the Supreme Court for determining whether an issue is Teague-barred is not the merits of the old rule or even the recognition of the wisdom of the new rule, but whether the new rule was “dictated by precedent.” Caspari, 510 U.S. at 390, 114 S.Ct. 948. These conflicting cases confirm Thompson’s advisory nature.
Furthermore, the rule that the majority claims was established is not a bright line rule. Rather, at most, Thompson states that defense counsel could not be excluded absent some “compelling justification.” See Majority at p. 957. Here, the prosecutor offered an explanation for seeking to present his reasons in camera; he did not want to reveal his strategy to the defense. Following Thompson and the other cases cited by the majority, it is now clear that this is not a valid reason not to follow the norm of an adversarial proceeding.[3] However, this was not dictated in 2001 when Ayala’s conviction became final.
In sum, I agree with the district court that the right to be present and have counsel present when the prosecution presented its reasons for its challenged recusals was not “dictated by precedent” when Ayala’s conviction was final, and therefore that the issue is Teague-barred.
II
Assuming that the issue is not Teaguebarred, I agree with the majority (and the California Supreme Court) that the exclusion of the defense from the Batson proceedings was error, and that it was not structural error. See Majority at pp. 959-GO. However, we again part company when determining the appropriate standard of review. The majority reads our recent cases to allow it to pose the question as “[if] we cannot say that the exclusion of defense counsel and the loss of the questionnaires likely did not prevent Ayala from prevailing on his Batson claim, then we must grant the writ.” See Majority at p. 963. However, pursuant to controlling Supreme Court opinions, we can grant relief only if, at a minimum, the California Supreme Court’s harmlessness determination was objectively unreasonable.
In Brecht v. Abrahamson, 507 U.S. 619, 633-37, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), the Supreme Court explained that collateral review is different from direct review. It held:
The imbalance of the costs and benefits of applying the Chapman harmless-error standard on collateral review counsels in favor of applying a less onerous standard on habeas review of constitutional error. The Kotteakos standard, we believe, fills the bill. The test under Kotteakos is whether the error “had substantial and injurious effect or influence in determining the jury’s verdict.” 328 U.S. at 776 [66 S.Ct. 1239]. Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in “actual prejudice.” See United States v. Lane, 474 U.S. 438, 449 [106 S.Ct. 725, 88 L.Ed.2d 814] (1986).
Id. at 637, 113 S.Ct. 1710 (parallel citations omitted).
*978 Three years after the Supreme Court decided Brecht, “Congress passed, and the President signed, the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), under which a habeas petition may not be granted unless the state court’s adjudication ‘resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. . . .' 28 U.S.C. § 2254(d)(1).” Fry v. Pliler, 551 U.S. 112, 119, 127 S.Ct. 2321, 168 L.Ed.2d 16 (2007).
Fry challenged his murder conviction on the grounds that the state trial court exclusion of a person’s testimony deprived him of constitutional due process. Id. at 115, 127 S.Ct. 2321. The state appellate court found that the trial court had not abused its discretion in excluding the testimony and noted in passing that there was no possible prejudice. Id. Fry filed a habeas petition in a federal district court. Id. The district court determined that the exclusion of the testimony had been “an unreasonable application of clearly established law,” and disagreed with the state appellate court’s determination that there was “no possible prejudice,” but nonetheless concluded that “there ha[d] been an insufficient showing that the improper exclusion of the testimony of Ms. Maples had a substantial and injurious effect on the jury’s verdict under the standard set forth in Brecht.” Id. at 115-16, 127 S.Ct. 2321 (internal quotation marks omitted). The Ninth Circuit affirmed, and the Supreme Court in turn affirmed the Ninth Circuit. Id. at 116, 122, 127 S.Ct. 2321.
In its opinion in Fry, the Supreme Court reconciled the Brecht standard with AED-PA. The Court explained:
In Mitchell v. Esparza, 540 U.S. 12 [124 S.Ct. 7, 157 L.Ed.2d 263] (2003) (per curiam), we held that, when a state court determines that a constitutional violation is harmless, a federal court may not award habeas relief under § 2254 unless the harmlessness determination itself was unreasonable. Petitioner contends that § 2254(d)(1), as interpreted in Esparza, eliminates the requirement that a petitioner also satisfy Brecht’s standard. We think not. That conclusion is not suggested by Esparza, which had no reason to decide the point. Nor is it suggested by the text of AEDPA, which sets forth a precondition to the grant of habeas relief (“a writ of habeas corpus ... shall not be granted” unless the conditions of § 2254(d) are met), not an entitlement to it. Given our frequent recognition that AEDPA limited rather than expanded the availability of habeas relief, see, e.g., Williams v. Taylor, 529 U.S. 362, 412 [120 S.Ct. 1495, 146 L.Ed.2d 389] (2000), it is implausible that, without saying so, AEDPA replaced the Brecht standard of “ ‘actual prejudice,’ ” 507 U.S. at 637 [113 S.Ct. 1710] (quoting United States v. Lane, 474 U.S. 438, 449 [106 S.Ct. 725, 88 L.Ed.2d 814] (1986)), with the more liberal AED-PA/Chapman standard which requires only that the state court’s harmless-beyond-a-reasonable-doubt determination be unreasonable. That said, it certainly makes no sense to require formal application of both tests (AEDPA/Chapman and Brecht) when the latter obviously subsumes the former. Accordingly, the Ninth Circuit was correct to apply the Brecht standard of review in assessing the prejudicial impact of federal constitutional error in a state-court criminal trial.
Fry, 551 U.S. at 119-120, 127 S.Ct. 2321(emphasis in original, parallel citations omitted).
Three aspects of the Supreme Court’s explanation are particularly important. First, the Court endorsed its opinion in *979 Esparza, 540 U.S. 12, 124 S.Ct. 7, that habeas relief was available only if the state court’s determination of harmlessness was unreasonable. Second, the Court reiterated that AEDPA “limited rather than expanded the availability of habeas relief.” Fry, 551 U.S. at 119, 127 S.Ct. 2321. Third, the Court held that the Brecht “actual prejudice” standard requires a greater showing than the “the more liberal AED-PA/Chapman standard which requires only that the state court’s harmless-beyond-a-reasonable-doubt determination be unreasonable.” Id. at 119-20, 127 S.Ct. 2321. These concerns led the Court to hold that:
in § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the “substantial and injurious effect” standard set forth in Brecht, supra, whether or not the state appellate court recognized the error and reviewed it for harmlessness under the “harmless beyond a reasonable doubt” standard set forth in Chapman, 386 U.S. 18 [87 S.Ct. 824].
551 U.S. at 121-22, 127 S.Ct. 2321 (parallel citations omitted).
Despite the relatively clear language in Fry, the majority, citing our decisions in Pulido v. Chrones, 629 F.3d 1007 (9th Cir.2010), and Merolillo v. Yates, 663 F.3d 444 (9th Cir.2011), revises the Brecht standard to require relief where the record is evenly balanced and a judge has “grave doubt about whether an error affected the jury.” See Majority at p. 962. How the majority reaches this conclusion is somewhat of a mystery.[4]
Our opinion in Pulido does not support the majority’s approach. The majority cites a single clause out of context: we “apply the Brecht test without regard for the state court’s harmlessness determination.” Majority at p. 961 (quoting Pulido, 629 F.3d at 1012). However, this clause comes at the end of a paragraph that explains:
In Fry v. Pliler, 551 U.S. 112, 127 S.Ct. 2321, 168 L.Ed.2d 16 (2007), the Supreme Court clarified that the Antiterrorism and Effective Death Penalty Act of 1996 (“AEDPA”) did not replace the traditional test for prejudice on collateral review — i.e., whether the error “had substantial and injurious effect or influence in determining the jury’s verdict.” Brecht, 507 U.S. at 623, 113 S.Ct. 1710. Moreover, Fry explained that we need not conduct an analysis under AEDPA of whether the state court’s harmlessness determination on direct review— which is governed by the “harmless beyond a reasonable doubt” test set forth in Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)— was contrary to or an unreasonable application of clearly established federal law. Fry, 551 U.S. at 119-20, 127 S.Ct. 2321 (citing 28 U.S.C. § 2254(d)(1)). This is because the Brecht test “obviously subsumes” the “more liberal AED-PA/Chapman standard which requires *980 only that the state court’s harmless-beyond-a-reasonable-doubt determination be unreasonable.” Id. at 120, 127 S.Ct. 2321. Accordingly, we apply the Brecht test without regard for the state court’s harmlessness determination.FN3 See id. at 121-22, 127 S.Ct. 2321.
FN3. It follows that we apply Brecht “whether or not the state appellate court recognized the error and reviewed it for harmlessness” under Chapman. Fry, 551 U.S. at 121-22, 127 S.Ct. 2321.
629 F.3d at 1012 and n. 3 (parallel citations omitted). Thus, Pulido does not suggest that we may disregard the California Supreme Court’s determination that the constitutional violation was harmless.
Merolillo is arguably more ambiguous. The opinion first recognizes that we look to the last reasoned decision of the state court and that the state court’s findings “are entitled to a presumption of correctness unless the petitioner rebuts the presumption with clear and convincing evidence.” 663 F.3d at 453 (citing 28 U.S.C. § 2254(e)(1)). The opinion quotes from the Supreme Court’s discussion of harmless error in two opinions, Kotteakos v. United States, 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), and O’Neal v. McAninch, 513 U.S. 432, 435, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995). In O’Neal, decided after Brecht, the Supreme Court held “that in cases of grave doubt as to harmlessness the petitioner must win.” 513 U.S. at 437, 115 S.Ct. 992. It concluded that “when a habeas court is in grave doubt as to the harmlessness of an error that affects substantial rights, it should grant relief.” Id. at 445, 115 S.Ct. 992.
Merolillo goes on to cite Fry and Pulido, and in light of these cases held that:
the Brecht “substantial and injurious effect” standard governs our harmless error review in this case. For the reasons discussed below, we conclude that under the Brecht standard, Merolillo is entitled to habeas relief. We further conclude that even if Merolillo were also inquired to satisfy the AEDPAJChapman standard, he would, as the state court’s determination that the error was harmless beyond a reasonable doubt was an objectively unreasonable application of Chapman.
663 F.3d at 455.
The arguable tension between the “grave doubt as to the harmlessness of an error” and AEDPA was relieved by the Supreme Court in Harrington v. Richter, — U.S. -, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011). There, the Court reiterated that “[a] state court’s determination that a claim lacks merit precludes federal habeas relief so long as ‘fairminded jurists could disagree’ on the correctness of the state court’s decision. Yarborough v. Alvarado, 541 U.S. 652, 654, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004).” Id. at 786. Justice Kennedy, writing for the Court, explained:
The Court of Appeals appears to have treated the unreasonableness question as a test of its confidence in the result it would reach under de novo review: Because the Court of Appeals had little doubt that Richter’s Strickland claim had merit, the Court of Appeals concluded the state court must have been unreasonable in rejecting it. This analysis overlooks arguments that would otherwise justify the state court’s result and ignores further limitations of § 2254(d), including its requirement that the state court’s decision be evaluated according, to the precedents of this Court. See Renico v. Lett, 559 U.S. —, 130 S.Ct. 1855, 176 L.Ed.2d 678 (2010). It bears repeating that even a strong case for relief does not mean the state court’s contrary conclusion was unreasonable. See Lockyer [v. Andrade ], [538 U.S. 63] at 75 [123 S.Ct. 1166, 155 L.Ed.2d 144 (2003) ].
*981 If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. Cf. Felker v. Turpin, 518 U.S. 651, 664, 116 S.Ct. 2333, 135 L.Ed.2d 827 (1996) (discussing AEDPA’s “modified res judicata rule” under § 2244). It preserves authority to issue the writ in cases where there is no possibility fair-minded jurists could disagree that the state court’s decision conflicts with this Court’s precedents. It goes no farther. Section 2254(d) reflects the view that habeas corpus is a “guard against extreme malfunctions in the state criminal justice systems,” not a substitute for ordinary error correction through appeal. Jackson v. Virginia, 443 U.S. 307, 332, n. 5, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (Stevens, J., concurring in judgment). As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court’s ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.
131 S.Ct. at 786-87 (parallel citations omitted).
In reiterating that a writ may issue only where there is no possibility that fairminded jurists could agree with the state court’s decision, the Supreme Court refined the “grave doubt” standard set forth in Brecht. A federal court cannot have “grave doubt” as to harmlessness if a fair-minded jurist could agree on the correctness of the state court’s decision. See Harrington, 131 S.Ct. at 786. The Court explained that “[ujnder § 2254(d), a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court’s decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court.” Id.
Accordingly, pursuant to Supreme Court precedent, a writ may not issue just because “we cannot say that the exclusion of defense counsel and the loss of questionnaires likely did not prevent Ayala from prevailing on his Batson claim.” Majority at p. 963. Rather, a writ may issue only if we determine that no fairminded jurist could find that the exclusion of defense counsel and the loss of questionnaires did not prevent Ayala from prevailing on his Batson claim. This is the essence of the Supreme Court’s holdings and we should accept it as such. See, e.g., Harrington, 131 S.Ct. at 786-87 (“As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court’s ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.”).
Ill
The application of the fairminded jurist standard requires deference to the California Supreme Court’s opinion.
A. The Loss of Certain Prospective Jurors’ Questionnaires.
The majority stresses the “loss of an overwhelming majority of the jury questionnaires” in concluding that this “increased the prejudice that Ayala suffered as a result of the exclusion of defense counsel.” Majority at pp. 958, 959. However, Ayala has not shown either that the loss of certain prospective jurors’ questionnaires violated his constitutional rights or that the loss prejudiced him.
*982 First, it is critical to note what was in the record before the California Supreme Court. The record contained the voir dire of all prospective jurors, the transcript of the in camera hearings on the prosecutor’s reasons for the recusals, the questionnaires of all the seated jurors, and the questionnaires of the alternate jurors. What was missing were the 77-question, 17-page questionnaires that the 200 or so other potential jurors had filled out.
In Boyd v. Newland, 467 F.3d 1139 (9th Cir.2006), we recognized that the Supreme Court’s opinion in Miller-El v. Dretke, 545 U.S. 231, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005), holds that “comparative juror analysis is an important tool that courts should utilize in assessing Batson claims.”[5] Boyd, 467 F.3d at 1145. We commented that “comparative juror analysis” referred “to an examination of a prosecutor’s questions to prospective jurors and the jurors’ responses, to see whether the prosecutor treated otherwise similar jurors differently because of their membership in a particular group.” Id. Boyd concluded:
A reviewing court cannot examine the “totality of the relevant facts” and “all relevant circumstances,” Batson, 476 U.S. at 94, 106 S.Ct. 1712, surrounding a prosecutor’s peremptory strike of a minority potential juror without an entire voir dire transcript. A transcript of the complete voir dire, as distinct from a partial transcript up to the time of the Batson motion, is proper because comparative juror analysis is appropriate both at the time of the Batson motion and in light of all subsequent voir dire testimony.
467 F.3d at 1151(internal citation and parallel citations omitted). Here, we have the entire voir dire transcript. Moreover, there is nothing in Boyd to suggest that in addition to voir dire, juror questionnaires from jurors who are not selected are critical to a determination of the totality of the relevant facts.
Indeed, the opposite conclusion can be drawn from the panel’s treatment of a state rule requiring an indigent defendant to show some cause in order to receive a free transcript of voir dire. We held, citing United States v. MacCollom, 426 U.S. 317, 322-23, 96 S.Ct. 2086, 48 L.Ed.2d 666 (1976), that the local rule did not violate the constitution, but that the state court erred in failing to recognize that the defendant had raised a plausible Batson claim entitling him to a transcript of voir dire. Boyd, 467 F.3d at 1151. If a defendant can be required to show some cause in order to receive a transcript of voir dire, it follows that a defendant has no per se right to the preservation of all questionnaires filled out by prospective jurors who were not seated.
To be fair, there is language in our en banc opinion in Kesser v. Cambra, 465 F.3d 351 (9th Cir.2006) (en banc), that might be read to infer a right to juror questionnaires. We concluded that: “In this case, an evaluation of the voir dire transcript and juror questionnaires clearly and convincingly refutes each of the prosecutor’s nonracial grounds, compelling the conclusion that his actual and only reason for striking Rindels was her race.” Id. at 360. It appears that in Kesser, the juror questionnaires were available and thus we could consider them, but we did not indicate that they were necessary. Instead, we commented that a comparative juror analysis was appropriate because “[w]e too have a transcript of voir dire and a Batson *983 claim fairly presented, and that is all Miller-El requires.” Id. at 361.
Recently, in Briggs v. Grounds, 682 F.3d 1165 (9th Cir.2012), we considered Batson challenges to a state court conviction where the federal record did not contain the questionnaires of excused jurors. Id. at 1170. In affirming the district court’s denial of relief, the majority noted:
The dissent seems to conclude that because we cannot independently verify the answers from the questionnaires as they are not in the record, the defense’s characterization is equally, if not more, plausible despite the state court determinations to the contrary. However, “AEDPA imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt,” Jackson v. Felkner,[sic] — U.S. —, —, 131 S.Ct. 1305, 1307, 179 L.Ed.2d 374 (2011) (per curiam) (internal quotation marks omitted) (overturning the Ninth Circuit). The dissent’s readiness to doubt the state court determination based on the defendant’s characterization of the record does not apply the appropriate level of deference Congress and the United States Supreme Court have required of us.
Id. at 1170-71 (parallel citation omitted). The majority further noted that “it is widely acknowledged that the trial judge is in the best position to evaluate the credibility of the prosecutor’s proffered justifications.” Id. at 1171 (internal citations omitted). Citing the Supreme Court’s statements in Rice v. Collins, 546 U.S. 333, 338-39, 126 S.Ct. 969, 163 L.Ed.2d 824 (2006), that a “federal habeas court can only grant Collins’ petition if it was unreasonable to credit the prosecutor’s race-neutral explanations for the Batson challenge,” the majority stated:
it would be anathema to AEDPA if we were to assume that the petitioner’s contentions about the questionnaires are true simply because the record before us does not contain the excused jurors’ questionnaires. The burden to disprove the factual findings rests with Briggs. 28 U.S.C. § 2254(e)(1) (requiring “clear and convincing evidence” to rebut “a determination of a factual issue made by a State court”).
Id. Thus, under controlling Supreme Court and Ninth Circuit case law, the lack of prospective jurors’ questionnaires does not relieve Ayala of his burden to show by clear and convincing evidence that the California Supreme Court was wrong in determining that the prosecutor was not biased.
In the absence of any authority holding that the lost jurors’ questionnaires inherently deprives a reviewing court of a sufficient record to evaluate a Batson claim, the issue becomes whether Ayala has shown that the lack of the questionnaires in his case renders the record insufficient. He fails in this task for several reasons.
First, the California Supreme Court reasonably rejected Ayala’s claim that his constitutional rights were infringed by the loss of the bulk of prospective juror questionnaires. It explained:
“The deficiency of which he complains is the absence of certain questionnaires, which were completed by prospective jurors, then lodged with the superior court, subsequently lost by its clerk’s office, and finally determined by the superior court to be beyond reconstruction. A criminal defendant is indeed entitled to a record on appeal that is adequate to permit meaningful review. That is true under California law. [Citation.] It is true as well under the United States Constitution — under the Fourteenth Amendment generally, and under the Eighth Amendment specifically when a sentence of death is involved. [Citation.] The record on appeal is in *984 adequate, however, only if the complained-of deficiency is prejudicial to the defendant’s ability to prosecute his appeal.” ([People v. Alvarez, 14 Cal.4th 155] at p. 196 fn. 8, 58 Cal.Rptr.2d 385, 926 P.2d 365 [ (1996) ]).
Ayala, 99 Cal.Rptr.2d 532, 6 P.3d at 208. The California Supreme Court concluded that if the loss of the questionnaires was error under either federal or state law, “it was harmless beyond a reasonable doubt.” Id. This determination is entitled to deference. Rice, 546 U.S. at 338-39, 126 S.Ct. 969.
Second, the importance of the missing juror questionnaires is questionable. The questionnaires of the 70 or so jurors who were never called have little relevance. The questionnaires of those jurors who were called and then excused would be relevant only if there was some showing that the jurors were excused due to constitutionally forbidden reasons. However, Ayala has not offered any specific allegations concerning the missing questionnaires.
Third, none of the prosecutor’s stated reasons for recusing the questioned jurors relied solely on the jurors’ questionnaires. Rather, in each instance the prosecutor mentioned the juror’s specific answers to questions posed on voir dire. In a couple of instances the prosecutor referenced a person’s questionnaire, but this was primarily to explain why he found the individual’s oral responses troubling.
Finally, Ayala has been able to present his specific Batson challenges based on the voir dire transcript and the extant questionnaires of the seated jurors and alternates. Although Ayala argues that the lost questionnaires might support his arguments, such a contention can be made about any lost document. If such speculation constituted prejudice the standard would be reduced to a per se rule.
B. Challenges to the Individual Jurors.
It follows that the next question is whether Ayala has shown by clear and convincing evidence that no reasonable jurist could have credited the prosecutor’s non-discriminatory reasons for excusing the seven jurors in issue. The majority only discusses three of the jurors in its opinion, but a review of the prosecutor’s reasons for excusing each of the seven jurors shows that the California Supreme Court’s determination that “the challenged jurors were excluded for proper, race-neutral reasons,” was reasonable. See Ayala, 99 Cal.Rptr.2d 532, 6 P.3d at 204.
1. Olanders D.
Olanders D.’s recusal was one of the first challenged by Ayala. The trial court held that Ayala had not met the first prong of the Batson test (a prima facie showing that the challenge was based on race, see Kesser, 465 F.3d at 359), but nonetheless indicated that it would hear the prosecutor’s reasons for the recusal in order to have a complete record. The prosecutor stated in the ex parte proceeding:
My primary concern with regard to [Olanders D.] is his ability to vote for the death [sentence] during the penalty phrase. On his questionnaire he indicated that he does not believe in the death penalty. He did indicate that his view had changed over the last several years. He told us that he did want to serve. During the time that he was questioned, I felt that his responses were not totally responsive to the questions of either counsel for the defense or myself.
My observations in reading his questionnaire and before even making note of his racial orientation was that his responses on the questionnaire were poor. They were not thought out. He demonstrated *985 a lack of ability to .express himself well. And his answers did not make a lot of sense. As a result, I felt that he is not a person who could actively participate in a meaningful way in deliberations with other jurors, and his ability to fit in with a cohesive group of 12 people I sincerely question, and it was for that reason plus his stand on the death penalty that led me to believe that I did not want him on this jury.
The trial judge responded:
Okay. Certainly with reference to whether or not he would get along with 12 people, it may well be that he would get along very well with 12 people. I think the other observations of counsel are accurate and borne out by the record.
The California Supreme Court held that the record showed that the challenged jurors were excluded for proper, race-neutral causes. Ayala, 99 Cal.Rptr.2d 532, 6 P.3d at 204. Addressing Olanders D., the court commented:
[T]he prosecutor stated he had exercised the challenge in part because his questionnaire indicated he opposed the death penalty. The prosecutor acknowledged Olanders D.’s oral statements that his views had changed, but commented that his answers were “not totally responsive to the questions of either counsel for the defense or myself.” He further stated, in essence, that Olanders D.’s difficulties in communicating led him to question whether he would “fit in” on the jury. The court disagreed with the latter point, noting, “it may well be that he would get along very well with 12 people,” but added: “I think the other observations of counsel are accurate and borne out by the record.”
99 Cal.Rptr.2d 532, 6 P.3d at 204. The California Supreme Court further noted that the trial court “credited the prosecutor’s opinion[] that Olanders D. opposed the death penalty.” 99 Cal.Rptr.2d 532, 6 P.3d at 206.
The majority claims that the prosecutor’s motives for excusing Olanders D. is suspect for several reasons. -First, Ayala “could have pointed to seated white jurors” who similarly expressed hesitancy to impose the death penalty. Second, the majority asserts that its review of the voir dire transcript shows that “Olanders D.’s answers were responsive and complete.” It further asserts that the responses of a seated white juror, Ana L., were just as unresponsive. Third, the majority argues that because Olanders D.’s questionnaire was lost, they “cannot know exactly what arguments defense counsel could have made to undermine” the prosecutor’s claim that Olanders D.’s questionnaire responses were poor. See Majority at p. 985. The majority concludes that none of the reasons proffered by the prosecutor should be sustained because one was rejected by the trial judge, “two failed to distinguish the juror whatsoever from at least one seated white juror,” and the fourth cannot be evaluated because his questionnaire was lost. Majority at pp. 985-86.
Were we reviewing the trial judge’s decision de novo, the majority’s approach might be persuasive. But the applicable standard is whether no fairminded judge could agree with the California Supreme Court’s determination that the juror was excluded for proper, race-neutral reasons. See Harrington, 131 S.Ct. at 786. Ayala does not come close to meeting this standard.
There is no suggestion that any seated juror raised a similar set of concerns as Olanders D. The trial judge, who had the opportunity to observe Olanders D., agreed with the prosecutor that Olanders D. was ambivalent about the death penalty, had not been responsive on his questionnaire, and lacked the ability to express himself clearly. Moreover, the trial judge *986 did not necessarily reject the prosecutor’s concern that Olanders D. could not participate in a meaningful way in jury deliberations, but rather only commented that he “may well be that he would get along very well with 12 people [on the jury].” The trial court’s determinations as affirmed by the California Supreme Court are presumed correct. Rice, 546 U.S. at 338-39, 126 S.Ct. 969 (“State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by ‘clear and convincing evidence.’ § 2254(e)(1).”).
The majority’s expressed concerns about Olanders D.’s recusal are far from compelling. It is hardly surprising that a number of potential jurors expressed ambivalence about the death penalty. The fact that a prosecutor is more concerned with one potential juror’s ambivalence than another is not necessarily a sign of racial prejudice. Similarly, the fact that the majority in reviewing the voir dire transcripts thinks that a seated juror’s responses were no more responsive than Olanders D.’s is really of little moment. As noted, the trial judge — who heard Olanders D.’s voir dire — agreed with the prosecutor that he “demonstrated a lack of ability to express himself well.” The majority’s supposition that Olanders D.’s questionnaire responses may not have been “poor” is not clear or convineing evidence of anything. At most, the majority’s arguments and assumptions may suggest that the prosecutor’s evaluation of Olanders D. was not compelled, but none of them really question the sincerity of the prosecutor’s reasons or suggest a likelihood of some unstated improper motive.[6] The majority fails to show that a fairminded jurist could not have agreed with the California Supreme Court.
2. Gerardo 0.
Gerardo 0. was one of the recusals that Ayala challenged in his second objection. The prosecutor explained his challenge to Gerardo 0. as follows:
I made an observation of [Gerardo] when he first entered the courtroom on the first day that the jurors were called into the area.
At that time, he appeared to not fit in with anyone else. He was a standoffish type of individual. His dress and his mannerisms I felt were not in keeping with the other jurors.
He indicated to us at the beginning that he was illiterate. Actually, his words were that he was illiterate, and that he therefore had the questionnaire translated to him, so that he could make responses.
I observed him on subsequent occasions when he came to the court, and observed *987 that he did not appear to be socializing or mixing with any of the other jurors, and I also take into account his responses on the questionnaire and in the Hovey questioning process, at which time he expressed that he had no feeling with regard to the death penalty in writing. When being questioned, he said that he was not sure if he could take someone’s life, or if he could take someone’s life into his hands.
He further responded in the Hovey process that there would be eleven other people, that he felt a little shaky as far as his responsibilities in this case.
For those reasons, I felt that he would be an inappropriate juror, and for that reason, I exercised the peremptory challenge.
The trial court accepted the prosecutor’s reasons. It noted that the record supported the prosecutor’s observations and commented that the recusal was based on Gerardo O.’s individual traits. The California Supreme Court in rejecting Ayala’s Wheeler/Batson claim noted that “Gerardo 0. struggled with English and did not understand the proceedings.” Ayala, 99 Cal.Rptr.2d 532, 6 P.3d at 206.
The majority does not deny that Gerardo O. stated that he was illiterate, or that he needed someone to fill out his questionnaire, or that he dressed differently, or that he did not mix with the other jurors. See Majority at pp. 966-68. Instead, the majority speculates that Ayala’s- lawyer might have shown that (1) despite his own comments, Gerardo 0. was not illiterate, or that (2) Geraldo O.’s “dress and mannerisms were distinctly Hispanic.”[7] Majority at p. 967. It further muses that the prosecutor’s comments concerning Gerardo O.’s manner and aloofness and his ambivalence toward the death penalty could have been pretexts for an underlying racial bias.[8] Majority at pp. 967-68. Of course, it is impossible to negate such possibilities, but there is nothing but the majority’s imagination to fuel its assertions. Here, the trial judge agreed with the prosecutor’s observations of Gerardo 0. and the California Supreme Court affirmed. The majority has not presented the type of clear *988 evidence that the United States Supreme Court has held is necessary to overcome our deference to state court findings. See Rice, 546 U.S. at 338-39, 126 S.Ct. 969.
3. Robert M.
Robert M. was one of the last persons whose recusal was challenged. The prosecutor explained his reasons as follows:
As far as [Robert M.] is concerned, Miss Michaels and I had discussions during the selection process here in court, even as late as immediately before the exercise of the last challenge.
The court would note that I had passed at one point, leaving [Robert M.] on. I have always felt some degree of reluctance with regard to [Robert M.], and my concern primarily is in the area of whether, after conviction, [Robert M.] would actually vote for the death penalty, and it was my view that taking all of his responses in Hovey into account, and the — some of his responses even as late as yesterday — for example, the following of the Sagon Penn case. It was Miss Michaels doing the questioning at that time, and I did not actually — it would have been possibly a disadvantage or a disservice to inquire further as to his impressions about the Sagon Penn case. I’m concerned about that case because the fact that Mr. Penn, in a very notorious trial here, was found not guilty in a second trial, and allegations of misconduct with regard to the District Attorney’s office and the police were certainly rampant in that case.
There’s really no way for me to inquire as to where [Robert M.] actually stood. As far as [Robert MJ is concerned, our scores, a combination of all the factors— Mr. Cameron graded [Robert M.] as a four, Miss Michaels had rated [Robert M.] as a five, and my score on him was four to a five, somewhere in that area. I had before doing any of the selection process, resolved that at the very best, we would not wish to have any jurors on this case whose combined score was five or less.
In spite of that, I passed once on him, but it is my view, basically, that.because of his attitudes with regard to the death penalty, such as in his first response to whether he would always vote for — well, in the question number one about whether he would always vote for guilt, he indicated that it was a difficult question.
He said that he believed in the death penalty, but it was hard for him to be involved in the death penalty.
With regard to questions about whether he would vote for death, he said no, it would be hard to say, no, I don’t know what the evidence is, and Miss Michael’s reasons, which she expressed to me, and I have to agree with, is a great degree of concern about whether if we get to that point he could actually vote for death, and having that kind of a question in my mind as I’m trying this case would be distracting and worrisome to me during the process of the trial.
The trial judge accepted the prosecutor’s reasons noting that although Robert M. “is certainly pro the death penalty,” his answers varied and “there may well be a legitimate concern as to whether or not he could impose it.” The court further noted that “an appropriate use of a peremptory would be for a person that any party feels either could not vote for death or could not vote for life.” In affirming Ayala’s conviction the California Supreme Court observed “that Robert M. was less than desirable from the prosecution’s point of view.” Ayala, 99 Cal.Rptr.2d 532, 6 P.3d at 206.
Again, the majority does not really question the prosecutor’s reasons, but spec *989 ulates that had Ayala’s counsel been present he might have argued that Robert M.’s reluctance to impose the death penalty was not different from other jurors’ reluctance. Majority at pp. 969-70. In addition, the majority does not deny that Robert M. had stated that he had followed the Sagon Penn case, but argues that he only mentioned this briefly.[9] Majority at pp. 969— 70. Nonetheless, Robert M.’s interest in a recent notorious criminal case that involved misconduct by the prosecutor and resulted in a not guilty verdict is a legitimate non-discriminatory reason for recusal by the prosecutor.
4. The Other Jurors
The majority does not mention the other four minority jurors who were excused. Galileo S. was recused because he (a) displayed a non-conformist attitude to the justice system, (b) had more run-ins with the law than he admitted, and (c) had an attitude that might create alienation and hostility on the part of other jurors. Luis M. was challenged because he (a) expressed ambivalence on the death penalty, (b) had investigated the case on his own, and (c) left the military with a low rank suggesting some sort of misconduct or inability to perform. The prosecutor noted that George S. (a) had been a holdout juror on a prior jury, (b) was equivocal on the death penalty, (c) had been rejected as a police officer candidate, and (d) placed undue emphasis on the Bible. Barbara S. was challenged because (a) her responses to oral questions were slow, (b) she had an empty look in her eyes and seemed out of tune with what was going on, and (c) her written and oral answers were incomplete and non-responsive.
A review of the prosecutor’s reasons for excusing these jurors shows that, as with the three jurors mentioned by the majority, the prosecution team offered individualized reasons for each recusal. There is no blatant racism, no reference to stereotypes — veiled or otherwise, and no discern-able pattern of discrimination.
Nonetheless, the four recusals are susceptible to the type of speculative challenges that the majority hurls at the recusals of Olanders D., Gerardo O., and Robert M. Other jurors expressed ambivalence and equivalence about the death penalty. Other jurors offered slow or incomplete responses. Other jurors probably had been denied employment or performed poorly in a job. These might be appropriate avenues to explore at the time that a recusal is made. But we are reviewing a 1989 state trial pursuant to AEDPA, and the Supreme Court, in reversing the Ninth Circuit, recently reiterated that (a) Batson issues turn largely on evaluations of credibility, (b) the trial court’s determination is entitled to great deference, (c) the determination must be sustained unless it is clearly erroneous, and (d) AEDPA demands that state-court decisions be given the benefit of the doubt. Felkner v. Jackson, — U.S. -, 131 S.Ct. 1305, 1307, 179 L.Ed.2d 374 (2011).
Perhaps the California Supreme Court was not compelled to conclude that “the *990 challenged jurors were excluded for proper, race-neutral reasons.” Ayala, 99 Cal.Rptr.2d 532, 6 P.3d at 204. But its conclusion was certainly objectively reasonable.[10] Ayala has not shown that the California Supreme Court’s ruling “was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.” Harrington, 131 S.Ct. at 786-87. Indeed, it appears that, as in Harrington, the majority’s opinion “illustrates a lack of deference to the state court’s determination and an improper intervention in state criminal processes, contrary to the purpose and mandate of AED-PA and to the now well-settled meaning and function of habeas corpus in the federal system.” Id. at 787. I agree with the district court’s denial of relief and accordingly, dissent from the majority’s opinion.

. See Massachusetts Delivery Ass’n v. Coakley, 671 F.3d 33, 48 (1st Cir.2012) (reiterating that "[sjtate courts are not bound by the dictates of the lower federal courts, although they are free to rely on the opinions of such courts when adjudicating federal claims”) (internal citations omitted); Bromley v. Crisp, 561 F.2d 1351, 1354 (10th Cir.1977) (noting that "the Oklahoma Courts may express their differing views on the retroactivity problem or similar federal questions until we are all guided by a binding decision of the Supreme Court”); U.S. ex rel. Lawrence v. Woods, 432 F.2d 1072, 1076 (7th Cir.1970) (noting that "because federal courts exercise no appellate jurisdiction over state tribunals, decisions of lower federal courts are not conclusive on state courts”).

. Contrary to the majority's suggestion, it was the absolute nature of our holding in Menefield, not the fact that the reasoning in Menefield was based on Supreme Court cases concerning constitutional rights, that commanded our adherence to Menefield’s holding in Bell v. Hill, 190 F.3d 1089, 1092-93 (9th Cir.1999). See Majority at pp. 954-55.

. The California Supreme Court carefully considered the prosecutor's claim that his reasons would disclose matters of strategy. It concluded that the prosecutor had “simply [given] the reasons for his challenges, reasons that defendant was entitled to hear and that disclosed no secrets of trial strategy." Ayala, 99 Cal.Rptr.2d 532, 6 P.3d at 202-03. Accordingly, it concluded that "[i]t was unreasonable to exclude defendant from the hearings.” Id., 99 Cal.Rptr.2d 532, 6 P.3d at 203.

. In contrast to the standard set forth in the body of its opinion, the majority in footnote 11 recognizes that "[i]n holding that Ayala has demonstrated his entitlement to relief under Brecht, we therefore also hold to be an unreasonable application of Chapman the California Supreme Court's conclusion that Ayala was not prejudiced by the exclusion of the defense during Batson steps two and three or by the loss of the questionnaires.” I agree with this approach but not its conclusion. In order to reach the conclusion that the California Supreme Court’s determination that the constitutional violation was harmless, we must follow the Supreme Court’s opinion in Esparza, as cited in Fry, 551 U.S. at 119, 127 S.Ct. 2321, and determine that “the harmlessness determination itself was unreasonable.” (emphasis in original). Here, the California Supreme Court's determination of harmlessness was not objectively unreasonable.

. We further held that the right to a comparative juror analysis explicitly set forth in Miller-El was not Teague-barred as it "simply illustrates the means by which a petitioner can establish, and should be allowed to establish, a Batson error.” Boyd, 467 F.3d at 1146 (internal citation omitted).

. The only indicia of possible racial bias was the fact that seven of the eighteen peremptory challenges exercised by the prosecutor excused African-American and Hispanic jurors. If this were enough to compel a finding of racial bias, there would be no reason for the second and third steps in the Batson standard or for deference to the trial court’s determinations. The lack of any compelling evidence of racial bias is clear when the record in this case is compared to the prosecutor’s statements in Kesser, 465 F.3d 351. There, in overcoming the deference due to the state court’s determinations, we commented:
The racial animus behind the prosecutor’s strike is clear. When he was asked to explain why he used a peremptory challenge to eliminate Rindels, he answered using blatant racial and cultural stereotypes.
Id. at 357. Here, in contrast, all the majority can do is suggest that other jurors, like Olanders D., were uncomfortable with the death penalty, failed to offer thoughtful answers, and did not communicate well. But even if the prosecutor's perceptions about Olanders D. were incorrect or not unique, that fact would not be such compelling evidence of pretext as to justify a failure to defer to the California Supreme Court's reasoned determination that the jurors were excused for proper, race-neutral reasons. Ayala, 99 Cal.Rptr.2d 532, 6 P.3d at 204.

. The majority's cited quote from Hernandez v. New York, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991), demonstrates that Hernandez is not applicable to this case. The Supreme Court noted "the prosecutor’s frank admission that his ground for excusing these jurors related to their ability to speak and understand Spanish raised a plausible, though not a necessary, inference that language might be a pretext for what in fact were race-based peremptory challenges.” Id. at 363, 111 S.Ct. 1859. Here, the prosecutor did not mention any concern with Gerardo O.’s ability to speak Spanish and there does not appear to be any indication that any juror’s ability to speak Spanish was an issue. Instead, the majority having poured over the record to determine that Gerardo O., despite his own admission of illiteracy, had "attended college in the United States,” opines that he "was perfectly capable of reading the summary of legal issues that was given to prospective jurors.” Majority at p. 967. It then leaps to the unsupported conclusion that the "prosecutor’s purported reason for striking Gerardo O., then, was directly related to his status as someone who spoke Spanish as his first language.” Majority at p. 967. The majority’s speculation may not be illogical, but it is far from compelling.

. The majority also suggests that Gerardo O.’s ambivalence to the death penalty was no more pronounced than some seated white jurors. Majority at p. 968. As previously noted, the potential jurors’ attitudes toward the death penalty was an important consideration for both the defense and the prosecution. The fact that the prosecutor distinguished between levels of ambivalence that the majority over twenty years later argues are indistinguishable is hardly a sign of pretext. Moreover, there is no doubt that Gerardo O.’s qualifications — professed illiteracy, distinctive dress and aloofness, and ambivalence to the death penalty — were unique.

. The extent of the majority's speculation is illustrated by its argument that because another juror who was seated mentioned that he was aware of the capital case People v. Harris, 28 Cal.3d 935, 171 Cal.Rptr. 679, 623 P.2d 240 (1981), the prosecutor’s concern with Robert M.’s interest in the Sagon Penn case may have been pretextual. Majority at p. 970. This argument assumes that somehow the Harris case was similar to the Sagon Penn case. This seems unlikely as the crime in Harris took place in 1978, some eleven years before the jury selection process in this case. Moreover, unlike the alleged verdict in the Sagon Penn case, Harris was found guilty and the California Supreme Court’s opinion, which issued in 1981, did not find any serious misconduct by the district attorney.

. I do not agree with the characterizations of my dissent set forth in Section VI of the opinion. I have set forth my reasons in this dissent and trust that the reader will be able to discern the respective merits of the majority and dissent without further assistance. To the extent Section VI curtails the potential scope of the opinion, that, in my opinion, improves the disposition.